**UNITED STATES of America,**
**Plaintiff,**

v.

**UNITED ASSOCIATION OF JOURNEY-MEN AND APPRENTICES OF the PLUMBING AND PIPEFITTING IN-DUSTRY OF the UNITED STATES AND CANADA LOCAL UNION NUM-BER 24 et al., Defendants.**

**Civ. A. No. 444–71.**

United States District Court,
D. New Jersey,
Civil Division.

Feb. 16, 1973.

Supplementary Opinion and Final Order
Aug. 20, 1973.

**810**

Douglas Huron, and A. Thomas Hunt, Dept. of Justice, Washington, D. C., for plaintiff.

Parsonnet, Parsonnet & Duggan, by Thomas L. Parsonnet, Newark, N. J., for Electricians Local 52 & Electrical Joint Apprenticeship Committee.

Clancy & Callahan by Edward M. Callahan, Newark, N. J., for Essex Division, Northern New Jersey Chapter, National Electrical Contractors Ass'n and Electrical Joint Apprenticeship Committee.

## OPINION AND ORDER

### (Electricians Cluster)

GARTH, District Judge:

This action was brought on March 25, 1971, by the Attorney General on behalf of the United States, seeking relief from violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and from interference with the implementation of Presidential Executive Order 11246 forbidding racial discrimination in employment opportunities by government contractors. Pursuant to statutory mandate,[1] this case was assigned for hearing at the earliest practicable date.

At the outset of the proceeding each defendant moved for a severance because of the alleged peculiarities and differences among the various trades, contracts and practices. While denying the formal motions for severance, I structured the presentation of proofs and trial order as follows: the government initially would be required to present proofs common to all defendants with all defendants present; thereafter, the defendants by "cluster" or trade[2] would be deemed "severed" and each such "cluster" or trade would be tried separately. The parties agreed and stipulated that the initial or "common" part of the trial was to be incorporated into each separate trial of a "cluster" or trade.

To expedite the trials of all "clusters" the court scheduled and supervised pretrial discovery and pretrial conferences held at prescribed intervals, culminating in a formal pretrial order as to each "cluster" or trade. This procedure resulted in a complete stipulated consent decree with respect to the Operating Engineers and a complete decree entered upon stipulated facts with respect to the Plumbers.[3] In a similar fashion the

---

1. 42 U.S.C. § 2000e—6(b).

2. The "clusters" and respective defendants were designated as follows:

 (a) "Electricians" (Local 52, Electricians; the Electricial Joint Apprenticeship and Training Committee of Local 52; the Essex Division, New Jersey Chapter, National Electrical Contractors Association).

 (b) "Ironworkers" (Locals 11, 45, 373, 480 and 483, Ironworkers; Ironworker District Council of Northern New Jersey; Ironworkers Joint Apprenticeship Committee; Building Contractors Association of New Jersey; Associated General Contractors of New Jersey; Rigging Contractors of New Jersey; Structural Steel and Ornamental Iron Association).

 (c) "Operating Engineers" (Local 825, Operating Engineers; Associated General Contractors; Building Contractors Association; Structural Steel and Ornamental Iron Association; Local 825 Apprentice Training and Re-Training Fund).

 (d) "Plumbers" (Local 24, Plumbers; Plumbers Apprenticeship Trade School Joint Committee; Essex and Union County Division, Mechanical Contractors Association of New Jersey).

3. The Operating Engineers Decree was signed by the Court and filed on May 8, 1972; the Plumbers Decree was signed by the Court and filed on July 11, 1972.

Ironworkers and the government agreed upon all provisions to be incorporated in the Ironworkers decree other than those provisions relating to the requirements to be imposed on applicants seeking journeyman membership.[4] The remaining aspects of the Ironworker case were disposed of in an opinion and decree dated December 22, 1972.

The findings of facts herein are derived from stipulations of counsel, the pretrial order, and evidence adduced at trial.[5]

## JURISDICTION

The Court has jurisdiction over the subject matter of this action and the parties to it by virtue of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. The Attorney General is authorized under Section 707(a) of that Act to institute suit to enjoin a pattern or practice of discrimination and to request such relief as may be necessary to insure the full enjoyment of the rights described in Title VII, 42 U.S.C. § 2000e —6(a).

## FINDINGS OF FACT

*Parties*

1. Defendant International Brotherhood of Electrical Workers, Local Union Number 52 (hereafter Local 52), is an unincorporated association of persons engaged in the electrical trade. Local 52 has approximately 600 journeyman members and is a labor organization engaged in an industry affecting commerce within the meaning of Section 701(d), (e), of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(d), (e). Local 52's geographical jurisdiction includes all of Essex County, New Jersey, and its principal office is located at 717 South Orange Avenue, Newark, New Jersey (Uncontested Facts, paragraph 1; hereafter U.F. 1).

2. As of March 25, 1971, defendant Essex Division of the New Jersey Chapter, National Electrical Contractors Association (hereafter Essex Division), was a branch of the New Jersey Chapter containing those members of the Chapter having their principal offices in Essex County, New Jersey. Since January 1972, the Essex Division has been a branch of the Northern New Jersey Chapter of NECA. The members of the Essex Division are contractors engaged in the electrical construction industry, and one function of the Division is the negotiation of collective bargaining agreements on behalf of its members with Local 52. The principal office of the Northern New Jersey Chapter, National Electrical Contractors Association, is located at 1120 Morris Avenue, Springfield, New Jersey (U.F. 2).

3. The Electrical Joint Apprenticeship and Training Committee (hereafter

---

4. The government sought an Order to Show Cause (returned July 26, 1972) for the entry of the partial stipulated decree and for the addition of a paragraph (46A) supplementing paragraph 46 of the partial decree.

The provisions of the decree (other than paragraphs 33 and 34 pertaining to journeyman membership) with slight modifications had received the consent of all parties in February 1972. No decree was entered at that time pending trial and determination of the journeyman membership requirements.

All parties consented to the relief sought as to the entry of the decree (absent paragraphs 33 and 34), and on July 28, 1972 so much of the Order to Show Cause seeking entry of the partial decree was granted, and the decree was signed by the parties and entered and filed by the Court on that date. The relief sought with respect to supplementing paragraph 46 was denied, but the interpretation of paragraph 46 sought by the Building Contractors Association in a motion returnable at the same time as the Order to Show Cause resulted in the memorandum interpretation which appears at the end of the Ironworkers Opinion of December 22, 1972.

5. The foregoing restates the procedural history of this case as stated in the Ironworkers Opinion and Decree of December 22, 1972. The trial in this matter was held from June 13 to June 22, 1972.

JAC) is an unincorporated body composed of six members, of whom three are representatives of Local 52 and three are representatives of the Essex Division. The JAC administers and controls the apprenticeship training program in the electrical trade within the jurisdiction of Local 52 and selects participants for that training program. The JAC is a joint labor management committee controlling apprenticeship within the meaning of Section 703(d) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e—2(d). It principal office is located at 717 South Orange Avenue, Newark, New Jersey (U. F. 3, Pl.Ex. 14).

## Referral Procedures

4. Local 52 operates an exclusive hiring hall pursuant to its collective bargaining agreement with the Essex Division. That is, contractors who are parties to the agreement are obliged to hire electricians through Local 52. The union refers to the contractors the requisite number of men needed from among individuals who have registered for work at the hall. Three categories of electricians make use of Local 52's hiring hall: (1) members of Local 52; (2) members of other IBEW locals ("travelers"); and (3) persons who are not members of any IBEW local union (Pl. Ex. 13).

5. The agreement between Local 52 and the Essex Division establishes five priority groups for referral purposes. According to the agreement, all persons who are eligible for Group I and who have registered for work at the union hall are referred first, then all persons in Group II, all persons in Group III, all persons in Group IV, and finally all persons in Group V. A person in Group I always has a priority right to referral over all persons in Groups II through V, even though persons in Groups II through V may have registered for work before persons in Group I (Pl.Ex. 13; Tr. 29–32).

6. The collective bargaining agreement in effect on March 25, 1971, the date this action was instituted, provided that Group I would include all persons who (1) have four or more years experience in the trade, (2) are residents of northern New Jersey, or within commuting distance thereto, (3) have passed Local 52's journeyman examination, and (4) have been employed at least four years under a collective bargaining agreement between Local 52 and the Essex Division. In fact, all such individuals are necessarily members of Local 52, because the union admits into membership all persons who pass its examination. Group I contains no persons who are not members of Local 52. Groups II and III consist of "travelers," i. e., members of other IBEW locals, and Groups IV and V are comprised of individuals who are not members of any IBEW local union (U.F. 9; Pl.Ex. 13 [Art. VIII, 1968 Collective Bargaining Agreement]; Tr. 29–32).[6]

7. Eligibility for Group I has a great practical significance for an electrician since when work is slow, persons in Group I obtain referral jobs ahead of all other individuals (Tr. 30).

8. Only eight blacks were journeymen members of Local 52 as of March 25, 1971. Only these eight blacks, in contrast to other black electricians, were referred to jobs on a priority basis from Group I. All individuals not members of Local 52 or of another IBEW local who register for work at the union's hiring hall are referred from Groups IV or V and thus obtain work only after referrals are made from Groups I, II and III.

6. Article VII of the Collective Bargaining Agreement effective June 1, 1971, incorporates some changes in the referral groups. Most important, for present purposes, is that to qualify for Group I an electrician need only have worked for a period of one year in the last four under the Collective Bargaining Agreement instead of having worked for four such years. (Pl.Ex. 13).

Members of Groups IV and V often wait long periods for referral while Local 52 members are being referred more than once during the same period of time. For example, Allen Smith, a black electrician who is not a Local 52 member and not a member of another IBEW local, waited four months in 1970 for referral by Local 52 while individual union members in Group I were being referred on more than one occasion. Similarly, other black electricians such as Ronald Graham and James Malone, Jr., while not members of Local 52 or another IBEW local, waited for referral in 1967 and 1968 for periods of some two to three months while individual Local 52 union members were being referred out more than once. Joseph Watts, who is black and who is now a member of Local 52, worked on referral while not a member of any IBEW local for six years before he became a member of Local 52. During that six year period, he had to wait for referral until after union members had been sent to work. There was no evidence, however, that among individuals waiting for referral in any of the aforementioned Groups, any preference within a referral Group was given to whites over blacks. The difficulties experienced by black electricians seeking referral through Local 52 are directly attributable to the fact that they were not members of Local 52 or another IBEW local. (U.F. 4; Tr. 32; Tr. 2.64–2.68, 2.76–2.77, 2.174–2.175, 2.177–2.178, 7.3–7.6).

### Membership in Local 52

9. There are two principal means by which individuals achieve membership in Local 52: (A) direct admission as a journeyman member for persons who are experienced in the trade; and (B) apprenticeship—a four year program leading to journeyman status, designed for persons with little or no experience in the electrical trade (Tr. 27).

9A. *Direct Membership.* An experienced non-member electrician who is permitted by Local 52's Executive Board to take Local 52's journeyman examination will be admitted into journeyman membership in the union upon passing the examination. The collective bargaining agreement effective June 1, 1971, between Local 52 and the Essex Division provides that all persons having four years experience in the trade are eligible to take the examination (U.F. 9, 10; Tr. 32; Pl.Ex. 13).

9A.1(a) *Applicant Pool and Barriers to Minority Membership.* The majority of experienced non-member electricians who have achieved journeyman membership in Local 52 by passing the union's journeyman examination did not apply for membership. Instead the usual practice has been for the Business Manager to recommend to the Executive Board that certain non-members be brought into the union, even though the men themselves have not applied for membership; the Executive Board then invites these individuals to take the examination, and they are admitted as journeyman members of Local 52 if they pass it (Tr. 33–34).

9A.1(b) Local 52 had never admitted a black into the union as a journeyman member until November 1966. Between July 2, 1965 and March 25, 1971, Local 52 admitted directly into journeyman membership 67 persons who had not gone through an apprenticeship program sponsored by the Local. Of the 67, five (7.5 per cent) were black. The five blacks admitted directly into journeyman membership and their dates of admission are as follows:

| | |
|---|---|
| William McCraw | November 1966 |
| Luther Porter | April 1967 |
| Junius Copeland | November 1968 |
| Daniel Jacocks | March 1969 |
| Joseph Watts | October 1969 |

(U.F. 4)

9A.1(c) Local 52 refused to permit the following qualified black electricians who formally applied for journeyman membership to take the journeyman examination and thereby denied them any

possibility of direct journeyman membership:

| Name | Date of Application |
|------|--------------------|
| Julian Whitney [7] | July 20, 1961 |
| Roscoe Jennings [8] | September 6, 1962 |
| Ralph Garvin [9] | November 4, 1965 |

(U.F. 23, 77; Pl.Ex. 5A at minute entry dated 7–20–61, 9–6–62, 11–4–65; Tr. 33–34, 104–105, 135–136).

9A.1(c)(1) At the time of his application, Julian Whitney was 40 years old. Following his rejection, he complained to the New Jersey Division on Civil Rights. On September 7, 1961, Local 52's Executive Board informed Whitney that he could not be accepted because of his age. On the same date, the Executive Board permitted Norman Mack, then 47 years old, to transfer into Local 52 as a journeyman member. Mack is white. In the Autumn of 1960, the union had initiated a white apprentice, George Morton, who was 41 years old (U.F. 24, 76; Pl. Ex. 5A at 7–20–61, 8–17–61, 9–7–61; Pl. Ex. 7).

9A.1(c)(2) The Executive Board informed Roscoe Jennings on September 6, 1962, that "we are not taking new members due to poor employment situation." [10] On August 16, 1962, the Business Manager reported that the employment situation was "very good." On Sep-

tember 6, 1962, he reported that "the work situation had slackened off slightly." On September 20, 1962, he reported that the employment situation was "good" (U.F. 33; Pl. Ex. 5A at 9–6–62).

9A.1(c)(3) The present Business Manager of Local 52 has conceded that Ralph Garvin is a competent electrician but that the union refused to permit him to take the journeyman examination (Tr. 104–05, 135–36).

9A.1(d) James Malone, Sr., is a black electrical contractor. At a hearing held by the United States Civil Rights Commission in Newark in the late summer of 1962, he testified that Local 52 discriminated against blacks. Soon thereafter, Malone, Sr., met several times with Mr. Vehling, the Business Manager of the union, with regard to getting qualified minority electricians into Local 52. Malone, Sr., then began to send what he considered to be qualified black and Puerto Rican electricians to Local 52 to seek journeyman or apprenticeship membership. In 1962, he sent over 25 such individuals to the union to inquire about membership. None were accepted as apprentices and none as members (U.F. 4, 30; Tr. 2.28, 2.31, 2.42–2.45).

9A.1(e) As is noted in Finding 9A.-1(a), electricians who become journey-

7. The Union Minutes of July 20, 1961 describe Whitney as follows:
"JULIAN E. WHITNEY—before the E.B. seeking membership in L.U. Age 40, H.S. Graduate, 2 year College (Business) Service connected disability, nervous stomach. Three trade schools completed while in service. Worked John Brown, E.O., N.J. for approx. 1 year. Self employed as electrician for 5 years. Picatinny Arsenal as Electricians helper about 6 mo's 1949. Classified as electrician by N.J. State employment office." (Pl.Ex. 5A at 7/20/61).

8. The Union Minutes of September 6, 1962 describe Jennings as follows:
"R. JENNINGS—before the Board to inquire about membership. H.S. equivalency, special courses N.C.E. as Elec., age 37 codes and practices. Experience of 6 years as main. electrician for Dollin Corp., Irvington. Informed that at this time we are not taking new members due to poor employment situation. He inquired about work permits, in-

formed by the Business Manager he would work if work is available. Informed it is necessary to show up daily." (Pl.Ex. 5A at 9/6/62).

9. The Union Minutes of November 4, 1965 describe Garvin as follows:
"RALPH GARVIN—before the E.B. regarding membership. Age 34, Informed new members enter only through the apprenticeship program, no consideration can be given." (Pl.Ex. 5A at 11/4/65).
As to Garvin's competency, see Tr. 104–105.

10. E. Martin who presented himself before the Executive Board on September 6, 1962 regarding membership for his brother and J. Malone, Jr., inquiring about membership for himself both were informed that the employment situation was poor. J. Malone, Jr., is black. The race of E. Martin and his brother is not known. (Pl.Ex. 5A, 9/6/62; U.F. 77).

man members of Local 52 normally do not make formal application for membership. Instead the Business Manager recommends to the Executive Board that certain non-members be brought into membership, and the Board then invites these individuals to become members by passing the journeyman examination. Up to March 25, 1971, the date of filing of this action, there is evidence of the union having "reached out" in this manner for only one black construction (as opposed to maintenance) electrician, Joseph Watts; this was approximately six years after Watts, an experienced electrician, had first requested membership. Watts was admitted directly as a journeyman in November 1969 (U.F. 4, 48; Tr. 33.34, 7.3–7.7).

9A.1(f) In January 1971 Local 52 permitted another black electrician, Edroy Moore, to take its journeyman examination. Moore had explicitly requested the opportunity to take the examination in February 1970 but was not permitted to take it until January 1971, almost one year later, although it had been administered during that year. Moore failed to pass the examination at that time (January 1971) (U.F. 54–55; Tr. 41–43).

9A.1(g) In September 1971, following the institution of this action, Local 52 permitted Moore and four black electricians—Ivan Binns, William Holland, William Ledford, and John Williams—who had been working on referral, to take its journeyman examination. All four had been qualified to take the examination in January 1971, some three months prior to the date of filing of the complaint in this action, but there is nothing in the record to indicate that these four blacks were invited to take the examination until September 1971,

approximately six months after the institution of this action (U.F. 55, 77; Tr. 36–37).

9A.1(h) Ronald Graham, David Jackson, James Malone, Jr., and Allen Smith are all black electricians who have worked on referral through Local 52. All have more than four years experience in the trade and thus are eligible to take the journeyman examination under the provisions of the collective bargaining agreement. The union has never invited any of these men to take the examination (U.F. 9, 10; Pl. Ex. 13; Tr. 33, 34, 40–41).

9A.1(i) Since this action was commenced, the number of black and Spanish surnamed members of Local 52 has about doubled, reaching the present total of approximately 30. During this period, the union had no difficulty in finding qualified black and Spanish-surnamed individuals to take into membership (U.F. 4–5; Tr. 144).[11]

9A.2(a) *Channeling Blacks into Maintenance Jobs.* About two-thirds of Local 52's 600 journeyman members as of March 25, 1971, were engaged in construction work and made use of the union's hiring hall. The remaining one-third were divided among approximately 32 inactive or retired members, about 45 members working as supervisors (foremen) or owners, and about 123 members working as maintenance electricians. Maintenance work tends to be of a permanent nature, so maintenance electricians normally do not make use of Local 52's hiring hall. Maintenance men receive, on the average, twenty cents per hour less than construction scale, and they receive fewer fringe benefits than are afforded construction electricians.

11. In determining liability and entitlement to relief under Title VII of the Civil Rights Act of 1964, the court should focus primarily on the period of time up to the filing of the lawsuit, and the defendant's employment practices at that time. The necessity for affirmative relief may not be eliminated by the fact that a defendant has taken some initial steps toward eliminating discrimination since there may be no assurances that those steps will be continued. United States v. United Association, etc., Plumbers Local Union No. 73, 314 F.Supp. 160 (S.D.Ind.1969) ; United States v. Local 38, IBEW, 428 F.2d 144 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970). The evidence of the increase in the number of blacks hired since March 1971 goes to show only that qualified blacks were available for membership had the union determined to induct them.

They are also required to perform shift work, unlike construction electricians. These maintenance electricians, however, are competent electricians qualified to work on construction jobs (U.F. 4, 37; Tr. 46–48, 51).

9A.2(b) Members of Local 52 generally regard maintenance work as being less desirable than construction work. In recent years, the union has been unable to induce its members to take maintenance jobs over which it has jurisdiction. As a result, Local 52 has had to bring into membership electricians who are willing to do maintenance work. The union has, however, required as a condition of membership that such individuals sign a twenty-year waiver of their right to perform construction work. Employers who are parties to maintenance contracts are not members of the Essex Division. (U.F. 37–38; Tr. 48–51, 136, 8.89).

9A.2(c) The first four blacks to be admitted into Local 52 as journeyman members—McCraw, Porter, Copeland and Jacocks (See Finding 9A.1(b) *supra*)—were all admitted into the less desirable classification of maintenance electrician, and all were required, as a condition of membership, to sign a twenty-year waiver of their right to work on construction (U.F. 4; Tr. 48–51).

9A.2(d) Prior to his admission as a maintenance electrician, William McCraw had been working from 1962 through 1966 on construction referral through Local 52. He had applied for journeyman membership as a construction electrician on May 3, 1962, and on June 6, 1963, but was rejected without having been administered the journeyman examination on both occasions, even though he had nineteen years experience in the trade at the time of his first application. On the occasion of his first application, McCraw was told that it was the practice of Local 52 to take in members as apprentices and not as journeymen directly. In addition, McCraw was informed that the "employment situation" made it impossible for the union to take him in. Although several other apprenticeship applicants (race unknown) were turned away on May 3, 1962, "due to the employment situation," the union's minutes show that employment was "good" at that time. In 1966 Louis Vehling, then the Business Manager of Local 52, directed McCraw to the maintenance job which led to his admission upon the successful completion of the journeyman examination and the execution of a twenty-year waiver. McCraw was one of 22 maintenance electricians whom Local 52's Executive Board decided to admit as journeymen on June 16, 1966 (U.F. 40; Pl. Ex. 5A at 5–3–62).

9A.2(e) Prior to his admission as a maintenance electrician, Junius Copeland had worked on construction referral out of Local 52. On September 7, 1961, when he was about 27 years old, he and his two brothers and another black had applied for apprenticeship in the union. The Executive Board told him that he was too old and told all four blacks that no consideration could be given to their applications since there was a "long waiting list" for apprenticeship. At the time, however, Local 52 imposed no age limit on apprenticeship applicants, and on September 21, 1961, the union initiated five white apprentices between the ages of 27 and 30. Moreover, in spite of the "long waiting list," at least four whites, all sons of Local 52 members, who applied for apprenticeship *after* Copeland were "placed on the list"; *i. e.,* they were referred to work preparatory to formal initiation as apprentices. Copeland worked on referral out of Local 52 for seven years following his rejection as an apprentice, even though he had been told when he was rejected for apprenticeship that he would be given "first preference" to take the journeyman examination. (Copeland's two brothers could not get work through Local 52 following their rejection as apprentices; eventually they stopped trying when they got jobs with Western Electric (not through Local 52). E. Copeland, one of the brothers, had been a member of Local 1159, IBEW, at least

since 1961.) In 1968 Louis Vehling, Local 52's Business Manager, told Copeland that he could probably gain admission to Local 52 if he would take a maintenance job. Copeland agreed, and he was admitted as a maintenance electrician after signing the twenty-year waiver and successfully completing the journeyman examination the second time he took it. (U.F. 14, 25, 27, 42; Pl. Ex. 5A at 9–7–61; Tr. 6.184–6.188).

9A.2(f) Ronald Graham and James Malone, Jr., are step-brothers who are qualified black electricians. In 1963, James Malone, Jr., had about ten years and Ronald Graham about eight years experience working for James Malone, Sr., a black electrical contractor. At that time, they questioned Louis Vehling, the union's Business Manager, concerning the possibility of gaining apprenticeships. Vehling replied that they were too experienced to become apprentices and he advised against apprenticeships for them. On September 6, 1962, Malone, Jr., had applied for journeyman membership in Local 52 but was told that the union was not taking in new members because of the "poor employment situation." However, the employment situation was "very good" on August 16, 1962, "had slackened off slightly" on September 6, 1962 and was "good" on September 20, 1962. (U.F. 33; Pl. Ex. 5A at 9–6–62; Tr. 40, 2.161, 2.166, 2.169–2.170).

9A.2(g) In the Autumn of 1962, Graham and Malone, Jr., obtained maintenance jobs at the Newark Housing Authority through Local 52. They were laid off from these jobs in mid-1965. In late 1965, they began seeking construction work through Local 52's hiring hall. Early in 1966 they asked Vehling how they could become union members. Vehling replied that the only way to obtain membership was to go into the twenty-year maintenance program. Both declined, but they continued to be referred through Local 52 periodically. (Tr. 2.163, 2.165, 2.167–2.168, 2.171–2.172, 2.181).

9A.2(h) Joseph Watts, who was admitted as a journeyman member of Local 52 in November 1969, was the only black admitted directly as a journeyman prior to March 25, 1971, who was eligible to work on construction (i. e., who was not admitted as a maintenance electrician). Watts had been working on construction referral through Local 52 since 1963. Soon after he began working on referral, he inquired about union membership, and Louis Vehling told him that he would notify him when it was possible for Watts to be admitted. At the time of his inquiry, Watts had at least ten years experience in the electrical trade (U.F. 4, 48; Tr. 7.3, 7.5, 7.9–7.11. See Finding 9A.2(c)).

9A.3(a) *Examination Procedure.* Local 52 utilizes an examination which individuals must pass as a condition of journeyman membership in the union. Local 52's Examining Board administers the examination and grades it. Examination papers are identified by the name of the examinee appearing on the answer sheet (U.F. 9; Tr. 3.123–3.124, 3.156–3.157).

9A.3(b) The Examining Board exercises wide discretion in determining what type of examination to administer. It has chosen to administer a written test containing many questions dealing with electrical theory and practice. The examination has no manual component; i. e., an applicant is not called upon to demonstrate his competence with tools and materials in a typical working situation. The examination does not differ according to the type of work,—e. g., maintenance versus construction—for which the examinee has applied (Tr. 3.127, 3.145–3.147, 3.160, 3.161).

9A.3(c) An electrician may not be able to answer a theoretical question on the examination, yet may still be able to perform his work satisfactorily. For example, one question on the examination relates to Ohm's Law. In theory, it is necessary to understand this law in order to be able to determine the proper size of wire to use for a particular job.

In fact, however, an electrician can determine the size of the wire that should be used by following the blueprints and specifications for the job (Tr. 3.147, 3.-164).

9A.3(d) The Chairman of the Examining Board testified and the Court finds that blacks do not perform as well as whites on Local 52's journeyman examination. The union has never subjected the examination to any validation study to determine whether it accurately measures the skills required of the average journeyman electrician. The Chairman of the Examining Board of Local 52 is not familiar with the EEOC Guidelines for validation of employment testing (Tr. 3.131, 3.136–3.137).

9B. *Membership in Local 52 Through the Apprenticeship Program*

9B.1(a) *Apprenticeship Selection from 1960 to 1965.* From 1960 through November of 1965, the Executive Board of Local 52 selected apprentices for the union. Those applicants who were approved by the Board for consideration for an apprenticeship would be placed "on the list"; *i. e.*, they would be referred to work as "helpers" for six months or more. If their work was satisfactory, they would then be initiated as apprentice members of Local 52 (U.F. 12–15; Tr. 105).

9B.1(b) On March 18, 1965, Local 52's Executive Board informed nine applicants, all white, that their apprenticeship applications had been approved. Of the nine, six had fathers who were union members, and one a brother who was a member of Local 52. On October 15, 1965, twenty-one applicants, all white, were informed that their apprenticeship applications had been approved. Of these, fourteen were sons of Local 52 members, one was a brother of a Local 52 member, another a brother-in-law of a Local 52 member, and another a nephew of a Local 52 member. Generally, from 1961 through 1965, the Executive Board gave great priority to relatives of union members in the apprenticeship selection process (Tr. 105; Pl. Ex. 5A

at 3–18–65, 10–15–65; Pl. Ex. 16; Pl. Ex. 24).

9B.1(c) At least thirteen blacks applied and were rejected for apprenticeship between 1961 and 1965:

| Name | Date of Application |
| --- | --- |
| Edward Copeland | September 7, 1961 |
| Junius Copeland | September 7, 1961 |
| Marvin Copeland | September 7, 1961 |
| Wendall Thomas | September 7, 1961 |
| R. Armour | September 21, 1961 |
| Williard Price | November 1962 |
| James Malone, Jr. | 1963 |
| Ronald Graham | 1963 |
| Savage Smallwood | June 6, 1963 |
| Dennis Nelson | June 6, 1963 |
| Raymond Barnette | June 6, 1963 |
| Richard Johnson | June 20, 1963 |
| James Dandridge | August 6, 1964 |

(U.F. 4, 77; Pl. Ex. 5A at 9–7–61, 9–21–61, 9–20–62, 6–6–63, 6–20–63, 8–6–64; Tr. 2.140, 2.143–2.145, 2.161, 2.166, 2.169–2.170, 6.187–6.188).

9B.1(d) At least three of the five blacks who applied for apprenticeship in September 1961 had experience in the electrical trade. One black, E. Copeland, was already a member of IBEW Local 1159 at the time of his apprenticeship application. The Executive Board informed all of the five applicants that they could not be accepted because of the "long waiting list for apprenticeship." Junius Copeland was also told that at 27 he was too old. At the time, however, Local 52 imposed no age limit on apprenticeship applicants. Moreover, in spite of the "long waiting list," at least four whites were "placed on the list" within eight weeks after the five blacks had been rejected (Finding 9A.-2(e); U.F. 27, 78; Tr. 6.186–6.187; Pl. Ex. 5A at 9–7–61, 9–21–61).

9B.1(e) Williard Price and R. Armour both applied for apprenticeship in the Autumn of 1962. Both were recent graduates from Essex County Vocational High School, and both had concentrated on electricity while in school. A union official informed Price in October or November of 1962 that Local 52 was just looking for journeymen at that time, and the Executive Board told Armour on September 20, 1962, that the

union was not taking in any new members "due to poor employment situation." The Business Manager reported, however, that with the exception of the first week in October 1962, the employment situation was "good" during this period of time (U.F. 33, 78; Pl. Ex. 5A at 9–20–62, 10–4–62, 10–18–62, 11–1–62, 11–15–62, 12–6–62; Tr. 2.141–2.145).

9B.1(f) In 1963 James Malone, Jr., and Ronald Graham asked Louis Vehling, then Business Manager of Local 52, if they could become apprentices. He replied that they were much too experienced to be apprentices. The previous autumn Malone, Jr., had applied for journeyman membership and was rejected (Finding 9A.2(f)).

9B.1(g) The four other blacks who applied for apprenticeship on June 6 and June 20, 1963 (see Finding 9B.1(c)) were told that, because of "considerable unemployment," they could not be given any consideration. They were told, however, that they were "on record, would be called." The union never communicated with any of these men concerning apprenticeships. On July 18, 1963, however, James Douglas, Jr., an 18 year old white with a father in the local, was placed "on the list"; i. e., he was referred to work as a helper prior to formal initiation. On that date, the employment situation in Local 52's jurisdiction, which had been "poor" on June 6, was reported as "improving slowly" but with still "quite a few men out of work" (U.F. 35–36; Pl. Ex. 5A at 6–6–63, 6–20–63, 7–18–63).

9B.1(h) When James Dandridge, a black, applied for apprenticeship with Local 52 in August 1964, he was already in his second year of apprenticeship with Local 24, IBEW, Baltimore, Maryland. The Board rejected his application, telling him "it's best he complete his apprenticeship in Baltimore which would then allow him to work throughout the country" (Pl. Ex. 5A at 8–6–64).

9B.1(i) Bernie Edmonson is a black electrical contractor and an instructor in electricity. In the Autumn of 1962, he and some other black contractors including James Malone, Sr., met with Louis Vehling, then Business Manager of Local 52, in an attempt to place black electricians in union work and also to get young blacks into the union's apprenticeship program. Vehling suggested that the contractors put together a list of men who would be qualified and interested. Edmonson visited churches and other black organizations and developed a list containing eighteen names. He attempted to submit the list to Vehling in the spring of 1963, but Vehling said that since work was slow, Edmonson should "wait until work picks up." When Edmonson again tried to give Vehling the list in the summer of 1963, Vehling said to "forget the whole thing" until some trouble at Barringer High School involving a black protest at a construction site was "ironed out" (Tr. 147–154).

9B.1(j) In 1962, James Malone, Sr., a black contractor, prepared a list of more than 100 blacks and Puerto Ricans who were interested in apprenticeship and forwarded the list to Local 52 through the Newark Mayor's Office. There is no evidence that the union ever accepted any of Malone's referrals. In addition, between 1962 and 1968, Malone, Sr., sent 25 blacks and Puerto Ricans with electrical experience to Local 52 to apply for apprenticeship or journeyman membership. None were ever accepted (Finding 9A.1(d), Tr. 2.239–2.-241, 2.243–2.244).

9B.1(k) In the summer of 1961, Julian Whitney, a black electrician, filed a complaint with the New Jersey Division on Civil Rights after Local 52 had rejected his application for membership. Because of the complaint, the union communicated with the Urban League in search of two blacks to work as helpers. The Urban League sent one, Robert Turner, who had some electrical experience. Turner began working in July 1961, and continued to work as a helper for 16 months. He was not taken into

the apprenticeship class which was initiated on September 21, 1961, nor was he taken into the class which was initiated on August 16, 1962, although at least four whites who began working as helpers after Turner were taken into the August 1962 class. Turner was admitted as an apprentice on November 15, 1962 (U.F. 23, 27–28; Pl. Ex. 15 at 60).

9B.1(*l*) On September 11, 1962, the United States Civil Rights Commission held hearings in Newark. One of the topics on the agenda was possible racial discrimination by building trade unions. Local 52's Business Manager testified at the hearings, and his report for September 20, 1962, contains the following entry:

"A Negro contractor named Malone made a number of statements to the commission, in our presence, to the effect that Local Union No. 52 does discriminate against Negroes. This the Business Manager denied.

While we were told we would only be on the stand for five minutes, we were questioned for over an hour.

Robert Turner—This young Negro boy has been working on permit as a helper for approximately a year and four months. On the advice of our attorney, Parsonnet, the Business Manager recommends that this boy be taken in to the Local Union as a wireman's apprentice."

On November 15, 1962, Robert Turner was initiated as an apprentice member of Local 52. He was the only apprentice initiated at that time. Turner was the only black apprentice initiated by the Executive Board from 1961 until November 1965, when the function of selecting apprentices was assumed by the JAC. Turner was also the only apprentice initiated during that period who was not taken in as part of a class. Local 52's Business Manager has testified that the union's failure to bring Turner in as part of the regular class initiated in August 1962 was the result of "an oversight" (U.F. 29–31, Tr. 136–138).

9B.1(m) On the basis of Findings 9B.1(k), (*l*), the Court finds that Robert Turner was permitted to become a helper only after pressure was put upon Local 52 by individuals who complained that the union was practicing racial discrimination, and that his initiation as an apprentice was the result of similar pressure. The treatment accorded Turner differed markedly from the treatment accorded whites by Local 52.

9B.2(a) *Apprenticeship Selection from November 1965 to 1971.* From its creation in November of 1965 by Local 52 and the Essex Division, the JAC has selected apprentices for Local 52. The JAC selects one class of apprentices each year (U.F. 12, 16).

9B.2(b) Between July 2, 1965, the effective date of Title VII, and March 25, 1971, six classes of apprentices were selected for Local 52—the first by the Union's Executive Board, the last five by the JAC. The following chart sets forth the total number of apprentices selected and the number of blacks selected for each class:

| Year | Total | Black |
|---|---|---|
| 1965 | 21 | 0 |
| 1966 | 12 | 1 |
| 1967 | 16 | 1 |
| 1968 | 19 | 2 |
| 1969 | 26 | 4 |
| 1970 | 32 | 5 |
| All Years | 126 | 13 |

It does not appear that Spanish-surnamed individuals were selected for any class (U.F. 5, 12, 16; Pl. Ex. 16; Pl. Ex. 2A).

9B.2(b)(1) *Apprenticeship Selection Procedures from November 1965 Through 1969.* From 1960 through 1969, there existed no established criteria which even purported to govern the final selection of apprentices. The Executive Board and later the JAC simply selected those apprentices they desired from among applicants who met certain minimum requirements, *e. g.,* age (18–25), residence (within New Jersey for four previous years), completion of high

school,[12] and (under the supervision of the JAC) passing selected portions of the General Aptitude Test Battery (GATB) administered by the New Jersey Employment Service, as well as attending a 15-minute oral interview before a JAC Board (U.F. 14–16, 18, 19; Tr. 59–60, 70, 71).[13]

9B.2(b)(2) Prior to 1970, the JAC did not award individual scores to applicants with respect to their overall qualifications for apprenticeship; all the applicants who qualified for and took the oral interview were simply placed on a roster on an ordinal basis following the completion of all interviews, and the JAC selected as many apprentices as were needed from the head of the roster. (U.F. 19; Tr. 60).

9B.2(b)(3) The Executive Board did not maintain records reflecting the race of apprenticeship applicants, and the JAC did not begin to maintain such records until 1968, although it is possible to determine the race of some applicants in 1967 by examining such items as birth certificates. For the three years 1967, 1968, and 1969, the JAC rejected at least sixteen black and Spanish-surnamed applicants who met all minimum standards then imposed by the JAC and who had work experience and education generally comparable to that of white applicants who were accepted. The sixteen individuals are Henry Williams, Miguel Cardona, Earl Jones, William Lugo, Ezekiel Maxey, Carl Boyd, John Bryant, John Whitley, James Dyer, George Fowlkes, Nathan Gallup, Freeman Harris, Jr., Nelson Moore, Jr., Arthur Rogers, Archie Troy, and Carl

Warren (Pl. Ex. 1A to 3B; Pl. Ex. 5A; Pl. Ex. 18A).

9B.2(b)(4) Among the blacks who were rejected for apprenticeship in the years 1967–1969 were such persons as Carl Warren, who graduated in the upper ten percent of his high school class and who had 16 months electrical experience, and James Dyer, who graduated in the upper one-quarter of his high school class. On the other hand, at least eight of the whites who were selected graduated in the bottom 15 percent of their class; six were in the bottom ten percent and two in the bottom two percent (Pl. Ex. 1A to 3B; Pl. Ex. 18B; Tr. 3.-187, 3.189–3.190, 3.192–3.192A).[14]

9B.2(c)(1) *Apprentice Selection Procedures After 1969.* After the 1969 apprenticeship selections had been announced, a number of black applicants who had not been selected filed complaints with the New Jersey Division on Civil Rights which informed the JAC of the complaints. Following discussions between the JAC and the agency, the JAC suggested and it was agreed that the JAC would develop a rating sheet to be used in scoring each applicant during the oral interview. The JAC also agreed to permit the blacks who had complained to the New Jersey Civil Rights Division to attend the oral interview for the 1970 class without having to resubmit to any of the preliminary screening procedures (U.F. 20; Tr. 7.-159–7.161).

9B.2(c)(2) The rating sheet developed following discussions between the JAC and the Civil Rights Division in 1969, was first used in 1970. Under the rat-

---

12. The high school graduation requirement was modified in January 1972 so that a high school equivalence certificate is now acceptable. See Finding 9B.3(a).

13. Prior to August 15, 1963, the Executive Board of Local 52 had no formal standards governing preliminary screening of apprentices. On that date the Board adopted age, residence and education standards. (U.F. 12–15; Tr. 105).

14. Evidence as to the high school achievements of Warren and Dyer is not proffered for the purpose of demonstrating that high school excellence is necessarily job-related. *See* Griggs v. Duke Power Co., 401 U.S. at 426, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Rather, it demonstrates that during the period in which the union and the JAC were using a high school degree requirement for apprenticeship admission, black applicants with better high school records than whites were rejected for apprenticeship.

ing system, a maximum of 100 points may be awarded as follows: Education (28); Physical Stature (5); Physical Appearance (5); Electrical Experience (5); Other Experience (10); Conduct Record (12); References (5); Interest (12); Attitude (12); and Financial Condition (6). The interview for each applicant lasts about 15 minutes and each member of the JAC scores the applicant on each of the above categories during the interview. Following the interview, the scores given the applicant by each of six raters are averaged. Those applicants who receive an average score of 70 or better are eligible for selection and are placed on a roster in order of their scores. The JAC selects as many apprentices as are needed from the head of the roster (U.F. 19, 21; Pl. Ex. 17C; Tr. 79, 106).

9B.2(c)(3) In 1970, a total of 67 whites and 17 minority applicants met all minimum requirements and attended the oral interview given by the JAC. Included among the 17 minority applicants were four blacks who had complained to the New Jersey Division of Civil Rights in 1969 and who were being re-interviewed pursuant to the agreement between that agency and the JAC (see Finding 9B.2(c)(1)). Three of the four were selected as apprentices. The white applicants averaged 70.6 points out of a possible 100. The minority applicants averaged 64.9 points. On the basis of these ratings, the average white applicant was eligible for selection, while the average minority applicant was not eligible. Five of the minority applicants were selected, compared to the selection of 27 whites. Three of the five minority applicants selected were blacks being re-interviewed pursuant to the JAC's agreement with the New Jersey Division on Civil Rights (Findings 9B.2(b), 9B.2(c)(1)–(2); U.F. 20, 62; Tr. 3.169–3.171; Pl. Ex. 17A).

9B.2(c)(4) The defendants introduced no evidence to show that a validation study to determine the relation between performance on the entire rating system and job performance was ever conducted. Moreover no evidence was adduced to show that the minority applicants in 1970 were in fact, on the average, any less qualified to become apprentices than the white applicants. On the contrary, the present Business Manager of Local 52, who is also Secretary of the JAC and participates in the rating procedure, believed that the black and white applicants were rated about evenly. Moreover, at least nine of the rejected minority applicants had work experience and education comparable to that of whites who were accepted. The nine are Michael Barrett, James Dyer, Herbert Hogans, Eugene Jones, Michael Mitchell, Vaughan Scott, Claborn Hudson, Robert Salter, and Kenneth Shearin. At least two of the rejected blacks graduated in the upper one-third of their high school class, one of which graduated in the upper one-quarter. At least thirteen of the accepted whites graduated in the bottom one-half of their class, four of whom were in the bottom 15 percent, and one of whom was in approximately the bottom ten percent[15] (Pl. Ex. 18A, 18B; Tr. 82).

9B.2(c)(5) The records demonstrate that the present Business Manager personally rated minority applicants, on the average, lower than whites in the category of "Interest." He testified, however, that the black applicants were not any less interested in apprenticeship than the whites (Pl. Ex. 17C; Tr. 83, 3.171–3.176).

9B.2(c)(6) Applicants for apprenticeship who have experience in the electrical trade are rated higher than applicants without such experience. One way in which such experience may be gained is by working as a "helper" through Local 52 (U.F. 63, 67; Pl. Ex. 17C, 23).

9B.2(c)(7) Local 52 does not publicize its "summer helper" program in the community; rather, word of the program gets out through the members of Local 52. In the past, numerous re-

15. *See* note 14 *supra.*

quests were made by friends and relatives of members of Local 52 to work as "summer helpers" and sons of members were given preference. In the summer of 1971, after this suit was filed, Local 52 selected a total of 41 persons to work as helpers. Three were black (U.F. 65–66, 68; Pl. Ex. 6 at 6–14–62).

9B.3(a) *High School Requirement.* Until January 1972, the JAC required all applicants for apprenticeship to be high school graduates. (At that time the policy was changed to permit acceptance of an equivalency certificate.) The present Business Manager has testified that the JAC's policy has been to accept any proof of completion of high school, including a letter from a school official; actual presentation of a diploma is not required. In 1968, however, the JAC rejected two black applicants, Michael Barrett and Rufus Daniels, stating as its reason that they had failed to produce a high school diploma. In both cases, the applicants had produced letters from high school officials certifying that they had graduated (U.F. 60; Tr. 84, 86–88).

9B.3(b) In 1968, the JAC rejected a Spanish-surnamed applicant, Wilfredo Cardona, because he had an equivalency certificate and had not formally graduated from high school. In 1969, two black applicants, Thomas Lollis and Samuel Smith, were rejected for the same reason. Cardona had experience working as an electrical helper, Lollis had been in the Army for three years, and Smith had taken some courses in electronics and had experience in the building trades as a laborer and carpenter. All three had experience which was comparable to that of some whites who were selected but all of whom had actual high school diplomas (Pl. Ex. 3A–3B; Pl. Ex. 18C; Tr. 3.183).

9B.3(c) The Census Bureau has prepared statistics relating to its 1970 census of the population which set forth level of educational achievement, by race, for persons 25 years and older.

According to these figures, in Essex County, approximately 53.3 percent of the whites, American Indians and Orientals 25 years and older have graduated from high school, as compared to 37.2 percent of the blacks and 15.5 percent of persons of Puerto Rican lineage. In Essex County, the median educational attainment figure for all males 25 and older is over 12 years; for comparable black males the median is 10.4 years; for Puerto Rican males, 8.2 years (Pl. Ex. 19B; Census Bureau Report PC(1)–C: General Social and Economic Characteristics for New Jersey, Table 120, 125, 130).[16]

9B.3(d) Defendant introduced no evidence to show that the educational disparities among racial groups in suburban Essex County with respect to persons *over* 25 years of age are less severe for persons *under* the age of 25. Hence the Court finds that the imposition of a high school graduation requirement by the JAC falls more severely on blacks and Spanish-surnamed persons than it does on whites.

9B.3(e) Although algebra and trigonometry and other high school courses may be relevant to an electrician's work, defendants have not shown that the requirement of high school graduation for apprenticeship applicants is significantly related to future performance either as an apprentice or journeyman electrician, nor have they shown that the imposition of that requirement is a business necessity. The JAC has never conducted a validation study to determine the relevance of the high school standard. The defendants produced an expert witness to testify on this point, but his conclusions were based on general observations and were not grounded on any comprehensive analysis (Tr. 72, 73, 7.110, 7.-118–7.120, 7.125–7.126).

9B.4(a) *GATB.* All apprenticeship applicants since 1966 have been required to pass a specific aptitude test designed to measure interest and aptitude for prospective electricians. To qualify for

---

16. This report became available after trial in this case had been completed.

consideration as an apprentice, an applicant must exceed a minimum norm in each of four categories (numerical aptitude, spatial aptitude, finger dexterity, manual dexterity). These norms are selected from the General Aptitude Test Battery (GATB) as particularly relevant to success as an electrician. GATB and the specific aptitude test for electricians derived from it was developed by the United States Training and Employment Service of the United States Department of Labor (USTES) in conjunction with state labor agencies. The specific electricians test used by the JAC here was developed jointly by USTES and a Texas labor agency. The New Jersey State Employment Service (NJSES) did not participate in the development of the test and does not prepare any questions for it; all GATB questions come directly from the USTES. The NJSES merely administers and grades the GATB examination at the behest of the JAC. I find that the administration of the test by the NJSES meets all standards of fairness.

A national survey conducted in 1970 by the National Joint Apprenticeship and Training Committee for the Electrical Industry indicated that at least 75 percent or about 302 Joint Apprenticeship Training Committees in the electrical industry throughout the nation utilized this test as a prerequisite qualification for apprenticeship training. The GATB test utilized by the JAC in the instant case is a "test" as defined by 29 C.R.F. § 1607.2 (Tr. 4.63–4.67, 4.70–4.72, 4.94–4.97, 4.106; D. Ex. D–7).

9B.4(b) In the years 1969 and 1970, the specific GATB examination employed by the JAC resulted in the disqualification of 13.8 percent of the white applicants who took the test and 34.1 percent of the blacks. Hence the court finds that the GATB examination used by the JAC falls more severely on blacks than on whites (U.F. 59, Tr. 71, 72).

9B.4(c) When the JAC decided to adopt the GATB in 1966, it made no inquiries to attempt to determine the test's relationship to job performance. The JAC has never conducted a validation study to determine the relevance of the GATB standard. The official in the New Jersey Employment Service who administers the GATB testified that he does not know whether the examination has been properly validated. An official in the federal Bureau of Apprenticeship and Training also testified that a question existed as to the validity of the GATB test within the federal Bureau of Apprenticeship and Training and that his agency does not require its use. The manual which accompanies the test states that it is to be used for the purpose of vocational counselling rather than for job-screening (Tr. 71–72, 130, 4.61–4.62, 4.65, 4.108–4.112, 5.6, 5.98–5.101, 7.143; D. Ex. D–7).

9B.4(d) The manual accompanying the GATB test demonstrates that, with respect to two sample groups given the test, a significantly higher percentage of "good workers" were chosen when the test was used than when it was not. In one instance, 68 percent of the nontest-selected workers were deemed "good workers" whereas 81 percent of test-selected workers were judged to be "good workers". Similar results were obtained in a cross-validation sample (D. Ex. D–7).

The criteria for choosing "good workers", however, does not comport with the validation requirements of 29 C.F.R. § 1607.5(b)(3) inasmuch as appraisal forms and instructions to the raters used in their designation of what constituted "good workers" were not introduced into evidence. Thus the court has not been shown what constitutes a "good worker" under the applicable federal standards. In addition, although the test manual (D. Ex. D–7) describes in detail the type of job for which the test was used, the defendants have failed to show under 29 C.F.R. § 1607.7(a) that the type of job for which the test was validated in the manual is comparable to the type of work engaged in by Local 52 members.

The GATB test has not been validated in compliance with EEOC Guidelines in several other important aspects. First, the test has not been validated for each minority group with which it is now being used (see D. Ex. D–7, at 1). Second, the defendants have not demonstrated that validation of minority group results on the test is technically unfeasible. In these respects, validation does not comport with 29 C.F.R. § 1607.-4(a), (b). See also 29 C.F.R. § 1607.-5(b)(5). Since the validation method applied is that of "concurrent validation," that is, the testing of a group of incumbent employees and apprentices and the correlating of their test scores with the quality of their performance on the job or in training programs, the possibility that there were no blacks or other minority group representatives among the incumbent apprentices or employees in the sample would render impossible the ascertainment of whether the test is valid for blacks or other minority groups. See Note, Employment Testing: The Aftermath of Griggs v. Duke Power Company, 72 Columbia L. Rev. 900, 913, 914 (1972). (The invalidity of concurrent validation where the sample is not representative of the minority population available for jobs in the local labor market is recognized by 29 C.F.R. § 1607.5(b)(1).) Finally, the defendants have not shown, in compliance with 29 C.F.R. § 1607.3(b), that "alternative suitable hiring . . . procedures" are unavailable for their use.

9B.5 *Residence Requirement.* The official Census Bureau figures show that persons from racial minorities are somewhat more mobile than whites in terms of prior residence. That is, proportionately more minorities than whites moved into New Jersey between 1965 and 1970. The court finds that the imposition of a durational residency requirement by the JAC falls with more severity on black and Spanish-surnamed persons than on whites. Local 52's Business Manager testified that the present residence requirement serves no business purpose, and the court finds that it does not (Census Bureau Report PC(1)–C: General Social and Economic Characteristics for New Jersey,[17] Tables 119, 125, 130; Tr. 8.92).

9B.6(a) *Recruitment and Availability of Apprentices.* At least 46 of the 135 persons selected as apprentices from July 2, 1965 to March of 1971, had relatives in Local 52 at the time of their selection. All 46 are white. Several of the white apprentices who graduated in the lower part of their high school class had relatives in the union (Pl. Ex. 16; Pl. Ex. 18V; Tr. 64, 3.183).

9B.6(b) Bernie Edmonson is a black electrical contractor who presently teaches electricity at the Newark Manpower Skills Center of the State Board of Education Vocational Center. While Edmonson's course does not prepare a student to be a journeyman electrician, it gives him a thorough grounding in basic electrical knowledge. Since Edmonson has been teaching the course, about 80 students have graduated, of whom 64 to 66 were black or Puerto Rican. Neither Local 52 nor the JAC has even communicated with Edmonson in an attempt to recruit his graduates for their apprenticeship program, and only one of his students has ever become an apprentice in Local 52 (Tr. 148, 155–158, 169).

*General Membership Characteristics of Local 52*

10.1(a) *Statistical Profile.* Local 52 did not admit its first black journeyman member until November 1966. As of March 25, 1971, Local 52 had approximately 600 journeyman members and 75 apprentice members. At that time, eight of the journeyman members (1.3 percent) and ten of the apprentices (13.-3 percent) were black. Hence, in the total of 675, there were eighteen blacks (2.7 percent) (U.F. 4–5).

17. *See* note 16 *supra.*

10.1(b) As of June 1972 [18] some eight years after the enactment of Title VII, 42 U.S.C. § 2000e, and fourteen months after the institution of this action, Local 52 had approximately 30 blacks or Spanish-surnamed members or apprentices (U.F. 4–5; Tr. 132).

10.1(c) Official 1970 Census Bureau statistics reflect that black persons constitute 30 percent of the total population of Essex County, the geographical jurisdiction of Local 52. The combined percentage for blacks and persons of Spanish heritage in Essex County is 39.1 percent (Pl. Ex. 19B; Tr. 4–5).

10.2(a) *Community Involvement and Reputation.* Local 52 has consistently opposed programs which would train persons from minority groups in the electrical field. In 1966 the union discouraged the establishment of a city program which would have trained 30 to 40 electrical apprentices at the Montgomery Street School in Newark. In 1968, the International President suggested that Local 52 form a joint committee with the Essex Division and the Urban League to seek out minority workmen and bring them into the union; such a committee was never established. Local 52 has also, in the language of its minutes, "rejected" the minority training program established at the New Jersey College of Medicine and Dentistry after the Newark race riots and has also rejected other similar programs. In the spring of 1968, when the Medicine and Dentistry College project was starting up and electrical contractors were under obligations to use their best efforts to obtain black workmen, a number of black electricians who wanted work on the job were unable to get referrals through the Local 52's hiring hall (U.F. 70–72; Tr. 98–99; 174–176, 3.112–3.113, 8.134–8.136).

■ 10.2(b) Local 52 has a reputation in the black community as being a union which discriminates against blacks.[19] The strength of this reputation is illustrated by the fact that in recent years, five experienced black electricians who lived within Local 52's jurisdiction and wanted work—John Webb, Clifton Plummer, Lawrence Griffin, Thomas Athill, and George Simmons —left the jurisdiction to seek work through Local 164, IBEW, Jersey City. All are now journeyman members of Local 164 (Tr. 178–179, 3.93, 3.95, 3.100, 3.114–3.115).

10.3 *Hiring Situation.* Local 52 took in about three times as many new members in the period 1966–1971 as were admitted between 1960 and 1965. Nevertheless, the size of the union has been decreasing in recent years, causing concern to both the Local and the International union. There is generally sufficient work within the jurisdiction to permit all the members of Local 52 to work, as well as upwards of 100 "travelers" (members of other IBEW locals) and non-members. In the summer of 1971, for example, about 125 travelers and 40 non-members were working through Local 52's hiring hall. In the summer of 1972, one of the slowest in years, there were still about 50 travelers and 50 non-members working. As of July 1971, at least 75 travelers and non-members have worked out of Local 52 long enough to qualify for various benefits, i. e., more than one year plus 1200 hours (U.F. 44–45; Pl. Ex. 20; Tr. 55–58, 126, 141–142, 8.129–8.133).

---

18. *See* note 11 *supra.*

19. In proving a pattern or practice of racial discrimination, evidence of the discriminatory reputation of a union and its joint apprenticeship program is relevant and admissible. Such evidence is admissible to show how and why blacks have been discouraged from applying for membership, referral or apprenticeship, and how and why some of those who did apply have been discouraged from pursuing their applications vigorously. Such evidence is also admissible because it has a direct bearing on the nature and extent of the "appropriate relief" to which the government is entitled. United States v. Local 86, Ironworkers, 443 F.2d 544 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed. 2d 367 (1971).

## GENERAL FINDINGS AND CONCLUSIONS OF LAW

### I. *Direct Journeyman Membership in Local 52*

■■ Until November 1966 no black or Spanish-surname electricians had been admitted directly as journeyman members of Local 52. The lack of black journeymen members did not result from a lack of applicants. At least three qualified black applicants who applied for direct journeyman membership during this period were turned away (Finding 9A.1(c)). This union conduct is prima facie discriminatory. As the court stated in Green v. McDonnell Douglas Corp., 463 F.2d 337, 344 (8th Cir. 1972), cert. granted, 409 U.S. 1036, 93 S.Ct. 522, 34 L.Ed.2d 485 (1972):

"When a black man demonstrates that he possesses the qualifications to fill a job opening and that he was denied the job, we think he presents a prima facie case of racial discrimination and that the burden passes to the employer to demonstrate a substantial relationship between the reasons offered for denying employment and the requirements of the job."

Here the union has not demonstrated any business necessity justification for the denial of employment to the three qualified blacks. Prior to July 2, 1965, the effective date of Title VII, the exclusion of blacks did not constitute a violation of Title VII of the Civil Rights Act of 1964,[20] but the pre-Title VII history of discrimination is probative as to the continuing discriminatory intent of the union and as to the present effect of past discriminatory practices. These past practices will also be taken into consideration in the fashioning of appropriate relief. United States v. Local I, Ironworkers, 438 F.2d 679, 683 (7th Cir.) cert. denied, 404 U.S. 830, 92 S.Ct. 75, 30 L.Ed.2d 60 (1971); Marquez v. Omaha Dist. Sales Office, Ford Div., 440 F.2d 1157, 1160 (8th Cir. 1971); Green v. McDonnell Douglas Corp., *supra,* 463 F.2d at 338, 339.

Subsequent to July 2, 1965, the discriminatory practices of the union continued as before. Ralph Garvin, for example, was not permitted to take the journeyman examination in November of 1965, just as Julian Whitney and Roscoe Jennings had been rejected previously (Finding 9A.1(c)). I find no business necessity justification for Garvin's rejection,[21] and thus the government's prima facie showing of racial discrimination stands unrebutted. Green v. McDonnell Douglas Corp., *supra.*

■■ I have found that the union discriminated against blacks in rendering it more difficult for them than for whites to take the journeyman examination which if passed would result in Local 52 membership. I further find that the journeyman examination falls more harshly on those blacks who have been permitted to take it than on whites, and has not been shown to be job-related under the standards set forth in the EEOC Guidelines, 29 C.F.R. § 1607.1 et seq. (Findings 9A.3(a)–(d)). *See* Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Tests or other measuring devices may be utilized to select applicants for union membership provided that the tests are not designed, intended, or used to discriminate by reason of race, color or national origin. However, in this situation where

---

**20.** I am not deciding whether or not the exclusionary practices of the union prior to as well as subsequent to July 2, 1965 may constitute a violaton of the civil rights of minority group applicants under 42 U.S.C. § 1981 (*see* Young v. International Tel. & Tel. Co., 438 F.2d 757 (3d Cir. 1971); Guerra v. Manchester Terminal Corp., 350 F.Supp. 529 (S.D.Tex.1972)) since this action is brought by the Attorney General under § 707(a) of the Civil Rights Act of 1964 rather than by a private litigant, and since neither party has raised the § 1981 question.

**21.** Although evidence of discimination against many blacks has been adduced in this case, a finding of discrimination by an employer against a *single* employee or applicant would suffice to constitute a violation of Title VII, 42 U.S.C. § 2000e–2(a)(1). Marquez v. Omaha Dist. Sales Office, Ford Div., 440 F.2d 1157, 1161 (8th Cir. 1971).

the journeyman examination disqualifies a proportionately higher degree of minority group applicants than whites, the union's failure to demonstrate by appropriate data that the examination given is a reasonable measure of performance for the job for which the examination is being used establishes the invalidity of that examination under Title VII and the regulations pursuant thereto. 42 U.S.C. § 2000e–2(h); 29 C.F.R. § 1607.1 et seq.; Griggs v. Duke Power Co., *supra*, 401 U.S. at 431, 91 S.Ct. 849. See Note, Employment Testing: The Aftermath of Griggs v. Duke Power Company, 72 Columbia L.Rev. 900 (1972).

The union-imposed barriers to direct journeyman admission into Local 52 for blacks are also borne out by the statistics. As I found earlier, between July 2, 1965, and March 25, 1971, (when this action was instituted), Local 52 had admitted 67 journeymen directly into its membership, only five of whom (7.5 percent) were black (Finding 9A.1(b)). In contrast, black persons constitute 30 percent of the total population of Essex County, the geographical jurisdiction of Local 52 (Finding 10.1(c)).

This statistical disproportion, especially in light of the instances of differential treatment and "facially neutral" practices which fall more severely on blacks than on whites, establishes a prima facie case of discrimination, shifting the burden of going forward and the burden of persuasion to the defendant union to demonstrate that the standards for union membership bear a substantial relationship to job performance. United States v. Local 169, Carpenters, 457 F.2d 210, 214 (7th Cir. 1972); United States v. Local 86, Ironworkers, 443 F.2d 544, 551 (9th Cir.), aff'g, 315 F.Supp. 1202 (W.D.Wash.1970), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971). Furthermore, the union is obliged to demonstrate that even if the standards for union membership are job

related, "there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential racial impact." Robinson v. Lorillard Corp., 444 F.2d 791, 798 (4th Cir. 1971), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1972). The defendant union has not overcome plaintiff's prima facie case of exclusion of blacks from direct journeyman membership under any of the above standards.

Finally, although the union discriminated against direct black journeyman membership into the union, it also discriminated against the blacks actually admitted into membership. Of the five blacks admitted, the first four were channeled into the less desirable job classification of maintenance electrician. As was required of all maintenance electricians, all four blacks were required to sign a 20-year waiver of the right to do construction work. The last black admitted (Watts) was accepted into the more desirable classification of construction electrician (Findings 9A.2(a)–(h)). As of March 21, 1971, there were approximately 400 construction electricians and 123 maintenance electricians in Local 52. Although the statistical sample may be too small in itself to be significant, the combination of the following factors comprises sufficient proof that blacks were discriminated against by way of exclusion from a more desirable job classification to constitute a violation of Title VII, 42 U.S.C. § 2000e–2(c)(2): (1) a disproportionate number of blacks accepted directly into the union were steered into the maintenance category; (2) the first four blacks were steered there while there existed more than three times as many construction electricians than maintenance electricians; and (3) substantial barriers to direct black admission into the union existed in the first instance.[22] The fact

---

22. For other examples of discriminatory job classification, see Marquez v. Omaha Dist. Sales Office, Ford Div., *supra*, 440 F.2d at 1163; United States v. Bethlehem Steel Corp., 446 F.2d 652 (2d Cir. 1971); United States v. Local 638, Steamfitters, 337 F.Supp. 217, 219 (S.D.N.Y.1972).

that blacks hired after the institution of this action as maintenance electricians may subsequently have been transferred to construction jobs (Tr. 121–23), does not absolve the union from having engaged in unlawful employment practices under Title VII. Parham v. Southwestern Bell Tel. Co., 433 F.2d 421, 426 (8th Cir. 1970). See note 11 supra.

II. *Membership in Local 52 Through the Apprenticeship Program.*

The court finds that, with one exception, Local 52 excluded blacks from its apprenticeship program until after the effective date of Title VII. Local 52's stated reasons for rejecting black applicants during this period—e. g., their age, the employment situation, the "long waiting list"—do not withstand scrutiny, and preference in selection was accorded to the relatives of the members of the all-white union. The admission of Robert Turner, the lone exception to the exclusionary pattern, was the result of pressure brought to bear on Local 52 by blacks who charged the union with practicing racial discrimination. The pre-Title VII pattern and practice of discrimination continued beyond the effective date of Title VII (July 2, 1965), and is probative as to the continuing discriminatory intent of the JAC. United States v. Local 1, Ironworkers, supra. I reject the suggestion by defendants that the "sins" of Local 52's procedures are not to be visited upon the practices of the JAC. I find that the JAC patterns and procedures for apprenticeship selection were adopted directly and without modification from those used by Local 52's Executive Board.[23]

▮▮▮▮ The court additionally finds that from 1966 through 1969, the JAC's procedure for selecting apprentices from among applicants who met minimum qualifications was completely subjective. White applicants fared better than mi-

nority applicants, and many minority applicants were rejected who were as or more qualified than whites who were selected under the standards then being applied by the JAC. The JAC's subjective procedure operated to exclude blacks and has not been shown to be related to job performance. Where such discrimination is shown "subjective, rather than objective, criteria carry little weight in rebutting charges of discrimination." Green v. McDonnell Douglas Corp., supra, 463 F.2d at 343. See Moore v. Board of Educ. of Chidester School Dist. No. 59, 448 F.2d 709 (8th Cir. 1971); Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1971), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972). The employment from 1966 to 1969 of these subjective and unreviewable standards for apprenticeship selection not shown to be significantly related to successful job performance was unlawful. Griggs v. Duke Power Co., supra; United States v. Local 86, Ironworkers, supra; United States v. Local 36, Sheet Metal Workers, 416 F.2d 123, 136 (8th Cir. 1969).

The court finds further that the system for selecting apprenticeship applicants introduced in 1970, while having some appearance of objectivity, retained much subjectivity. This last method has resulted in minority applicants scoring significantly lower than whites, even though no showing has been made that minorities were in fact less qualified; on the contrary, several rejected minority applicants were as or more qualified than whites who were selected under the standards then being applied by the JAC. Thus the still subjective rating system unrelated to job performance used subsequent to 1969 is unlawful as above.

The court finds further that the JAC has maintained standards for selection of apprentices which result in the disqualification of disproportionately more

---

23. See U.F. 15. In this connection I note that the JAC did not take over apprenticeship selection until November 1965 (see Finding 9B.2(a)). Therefore the Executive Board of Local 52 violated Title VII by discrimi-

nating against black applicants for apprenticeship from July 2, 1965, the effective date of Title VII, until the Executive Board relinquished its duties to the JAC in November of 1965.

minority applicants than whites. The defendants have not demonstrated that these standards bear a significant relationship to successful job performance, and therefore their application constitutes an unlawful employment practice. Griggs v. Duke Power Co., *supra*; United States v. Local 86, Ironworkers, *supra*, 443 F.2d at 552. This is true of the rating system as a whole as well as of the preliminary screening devices such as the high school graduation requirement and the durational residency requirement. As to the rating system, credit is given to persons with electrical experience, but only whites have been able to receive pre-apprenticeship experience working as helpers through Local 52. Nepotism has continued to play an important role in the selection of apprentices and "summer helpers". The preference that has been accorded to friends and relatives of members of the predominantly white union with respect to admission to the apprenticeship program constitutes, in the above context of discrimination, a violation of Title VII. Local 53, Asbestos Workers v. Vogler, 407 F.2d 1047, 1050 (5th Cir. 1969); United States v. Local 1, Ironworkers, *supra*, 438 F.2d at 683.

I find also that the high school requirement has in the past in some cases been applied more stringently to blacks, and certified black high school graduates have been rejected simply because they could not produce a diploma (Finding 9B.3(a)). The application of more stringent procedures to minority apprenticeship applicants than to white applicants constitutes an unlawful employment practice. 42 U.S.C. § 2000e—2(d); Griggs v. Duke Power Co., 420 F.2d 1225, 1231 (4th Cir. 1970), rev'd in part on other grounds, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

As to the GATB requirement, although I have found that the GATB is related to successful job performance it has not been validated under the EEOC standards (29 C.F.R. § 1607.1 et seq.) which the Supreme Court has concluded are expressive of congressional intent. Griggs v. Duke Power Co., *supra*, 401

U.S. at 436, 91 S.Ct. 849. This is not to say that should the JAC properly validate the test, it cannot be shown to comport to the guidelines at some future time. On the basis of the evidence presented, however, the defendants have not borne their burden of proving that the GATB, which falls more severely on blacks, is sufficiently job-related under the EEOC guidelines (See 9B.4(a)–(d)).

Finally, since the JAC is the representative and agent of the Essex Division of NECA and of Local 52, the unlawful employment practices of the JAC subject NECA and Local 52 to liability as well.

III. *Pattern and Practice of Discrimination.*

On the basis of the above findings, the court finds that Local 52, NECA, and the JAC have engaged in a pattern or practice of resistance to the rights which Title VII secures for black and Spanish-surnamed individuals. I find that this pattern or practice constitutes an unlawful employment practice under 42 U.S.C. § 2000e—2(a), (c), and (d). Since the union and the JAC have prevented minority individuals from acquiring membership and experience, the granting of referral priority under the collective bargaining agreement between Local 52 and the Essex Division to union members operates to preserve the advantages gained by whites as a result of the discriminatory practices of the union and the JAC. Thus, as with any practice apparently neutral on its face which perpetuates the effects of past or present discrimination in employment, the referral procedure itself constitutes present unlawful discrimination. United States v. Local 86, Ironworkers, *supra*, 443 F.2d at 552; United States v. Local 36, Sheet Metal Workers, *supra*; United States v. Local 38, IBEW, 428 F.2d 144 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970); Local 53, Asbestos Workers v. Vogler, *supra*.

### ORDER

Because the only proposed decree in this "cluster" was received from

the plaintiff, and due to the passage of time since the institution of this action, and particularly because a decree integrated as to all aspects of the parties' practices can best be formulated by the parties themselves now that the court has established the substantive guidelines,

It is hereby ORDERED, ADJUDGED and DECREED that within 45 (forty-five) days of the filing of this opinion, the parties submit (1) a joint proposed decree incorporating their proposals to remedy the violations of Title VII found by the Court to have occurred, and (2) a schedule of those matters and language as to which the parties cannot agree along with their respective contentions. Based on the particular violations and illegal practices referred to in the above opinion, the proposed decree should include specific remedial and corrective action directed in particular to *at least* the following factors:

(1) Direct Journeyman Membership Procedures

 (a) examination of applicants

 (b) nepotism

(2) Apprenticeship Selection Procedures

 (a) testing (continued use of GATB under the constrictions of 29 C.F.R. § 1607.9 may be permitted).

 (b) interviews

 (c) residence requirement

 (d) high school requirement

 (e) experience of applicants

 (f) nepotism

(3) Maintenance versus construction classification

(4) Referral procedures.

In addition to any and all other provisions required, the decree should include specific provisions for affirmative action dealing with advertisement of job openings, achieving parity of minority versus white workers, and procedures for reporting the progress of affirmative action programs to the court.

## SUPPLEMENTARY OPINION AND FINAL ORDER

### (Electricians Cluster)

GARTH, District Judge:

 In my opinion filed February 16, 1973, I directed that the parties submit a "joint proposed decree incorporating their proposals to remedy the violations of Title VII found by the Court to have occurred" along with a schedule of those matters upon which the parties could not agree. A consent decree following the guidelines set forth in my opinion has now been submitted. Only one area remains in which no agreement has been reached.[1] This area of disagreement concerns specific relief for individuals found to have been discriminated against in the Opinion and Order filed February 16, 1973. I have reviewed the findings therein and the submissions of all parties, and I have concluded that specific relief is warranted as to individuals who have been rejected as journeymen or denied admission into the apprenticeship program by the application of standards found by the Court to have been unlawful. *See* Opinion and Order of February 14, 1973, at 9A.1(c), (e)–(h), 9A.2(c), and 10.2(b) with respect to rejected journeymen, and at 9B.2(b)(3), 9B.2(c)(4) and 9B.3(a)–3(b) with respect to those denied admission into the apprenticeship program. No specific relief, however, shall be afforded to those individuals whose journeyman or apprenticeship status may have been delayed, but was not denied, as a result of defendants' practices. (This latter group consists of Joseph Watts, William McCraw, Luther Porter, Junius Copeland, Daniel Jacocks, Edroy Moore, Irvin Binns, William Holland, William Ledford, John Williams, George Fowlkes, Freeman Harris, and Carl Warren.) See 9A.1(e)–(g), 9A.2(c), 9A.2(h) of February 14 Opinion and Order. As to these last individuals, as well as with respect to those who have been rejected outright as apprentices or jour-

---

1. Inasmuch as the parties have agreed to paragraphs 1–26 inclusive and paragraph 30 of the Decree, review shall be deemed precluded as to these paragraphs. Appeal, if any, is limited to paragraphs 27, 28 and 29 of the Decree as set forth herein.

neymen, the United States contends that the Court's decree should provide for economic compensation for losses sustained as a result of practices found to be discriminatory and in violation of Title VII. Specifically, plaintiff requests that a special master be appointed by the Court to make factual determinations as to the specific losses (back pay) suffered by individuals identified by the Court as having suffered injury as a result of defendants' employment practices. Defendants oppose the awarding of back pay and the institution of any proceedings pertinent thereto.

■ The United States in effect requests the Court to reconsider an issue which was determined adversely to it pursuant to a motion for discovery, which was also treated as a motion to amend the complaint, on November 8, 1971. At that time, I determined that § 707 of Title VII, 42 U.S.C. § 2000e—6, under which the Attorney General brought this action, did not authorize the payment of back pay to individuals found to have been discriminated against by the defendants. This conclusion was reached by a comparison of § 707 and § 706 as they then stood: Section 706 (42 U.S.C. § 2000e—5(g)), which authorized suits by private individuals against employers or unions for discriminatory practices, explicitly permitted the court in its discretion to award back pay; in contrast, § 707 (42 U.S.C. § 2000e—6), which at that time alone authorized the institution of an action by the Attorney General, did not specifically so provide. Accordingly, I concluded:

> "Both the legislative history, equivocal though it may be, and the statutes themselves fortify me in the view that I take, that if Congress had intended that the Attorney General have in his power the right to assert back pay under Section 707, I think that Congress would have said so."

Tr. of Nov. 18, 1971, at pp. 1–2.

In my determination I found the reasoning of United States v. Georgia Power Co., 3 FEP Cases 767 (N.D.Ga.1971) persuasive. The United States points out that the Fifth Circuit has now overruled the Georgia Power district court opinion with respect to back pay. 474 F.2d 906 (5th Cir. 1973). *See also* United States v. Lee Way Motor Freight, Inc., 5 FEP Cases 492 (W.D. Okl.1972); United States v. Local 46, Wood, Wire and Metal Lathers, 328 F. Supp. 429, 441 (S.D.N.Y.1971); Davidson, "Back Pay" Awards Under Title VII of the Civil Rights Act of 1964, 26 Rutgers L.Rev. 741, 751 (1973). I have examined the Fifth Circuit's opinion in this regard and do not find its rationale compelling. The legislative history cited therein is, at best, ambiguous. Moreover, the 1972 Amendments to Sections 707 and 706, which now for the first time permit the Attorney General to bring an action under § 706 to enforce the rights of private complainants and therefore to benefit from the back-pay language of that section, suggest that the Attorney General did not possess the right to seek back pay prior to the effective date of the Amendments. (The Amendments apply only with respect to charges pending with the EEOC on or after March 24, 1972. Pub.L. 92–261, §§ 4, 5 and 14, 86 Stat. 104.)

Other considerations dictated against permitting discovery to proceed with respect to back pay in November of 1971. At that time the Court was faced with the need to proceed expeditiously. Motions for severance of parties and issues were pending. From both a statutory and practical standpoint, it was imperative that this case and the issues arising thereunder be given priority and that "the case . . . be in every way expedited." 42 U.S.C. § 2000e—6(b). I did not feel that the substantial issues of discrimination and the ultimate decrees should await determination of back-pay damages.

Further, in order to expedite the trial of this case, I have considered each of the four trades as a separate cluster (see Electricians' Opinion and Order of February 14, 1973, at note 2), and dealt

separately with each such cluster. Accordingly the case has progressed in discrete stages. The first decree entered was that of the Operating Engineers (May 8, 1972), the second, that of the Plumbers (July 11, 1972), and the third, that of the Ironworkers (December 22, 1972). Many of the provisions of these decrees were arrived at by negotiations among the parties, as was the case with the Electricians Cluster. If at this time I determine, contrary to my previous ruling, that back pay awards should be made, it is highly conceivable that each consent decree might require renegotiation and each court-ordered decree, reconsideration, thereby disrupting the progress already made by each of these trades in redressing the effects of past practices.

For all of these reasons, even were it within my discretion to award back pay, I would in any event decline to exercise such discretion in favor of a back-pay award. Kober v. Westinghouse Electric Corp., 480 F.2d 240 (3d Cir. filed May 25, 1973). The consent decree which the parties have negotiated and which I shall adopt as the decree of this Court follows the general guidelines set forth in my opinion of February 14, 1973. This decree, along with the specific relief I shall mandate, incorporates sufficient and adequate relief to correct and remedy the discriminatory employment practices found heretofore to have existed in the Electricians' trade.

For the reasons expressed above, and for the reasons expressed in my oral opinion of November 18, 1971,

It is hereby ordered, adjudged, and decreed that the following two paragraphs shall be incorporated into the final decree of this Court as paragraphs 27 and 28 of that decree:

27. Within 30 days of the date of entry of this Decree, Local 52 shall communicate by registered mail and by newspaper publication with all black or Spanish surnamed workmen who are not members of the union and who presently work in referral through Local 52 or who have done so in the past, explaining to them their rights to referral and membership under this Decree. In particular, Local 52 shall communicate, as above, with those persons listed below (List "A") offering to place their names at the top of the Group I referral register and to take them into membership upon satisfaction of the membership requirements of this Decree. Local 52 shall submit all such correspondence to the plaintiff for its approval prior to use. Local 52 shall have no obligation to place any individual listed below on the top of the Group I referral register who does not request such preference within 90 days from the entry of this decree.

List "A"

Allen Smith
Ronald Graham
James Malone, Jr.
Ralph Garvin
David Jackson [2]

2. The United States seeks to include John Webb, Clifton Plummer, Lawrence Griffin, Thomas Athill, and George Simmons—all currently members of Local 164, Jersey City—on List "A" as well. As to these five individuals, however, the record reflects only that they were discouraged from applying to Local 52 because of its reputation; no affirmative acts of discrimination by Local 52 against these five have been found. See Opinion and Order of February 14, 1973, at 10.2(b). For these reasons and because of their present job status, these five individuals will not be included on List "A".

28. Within 30 days of the date of entry of this Decree, the JAC shall communicate by registered mail with those persons listed below (List "B") offering to take them into the next apprenticeship class and notifying them that they may qualify for advanced placement if they have electrical experience. The JAC shall submit all such correspondence to plaintiff for its approval prior to use. Those persons on the list below who become indentured as apprentices in accordance with the provisions of this paragraph shall be credited toward the JAC's obligation to indenture 25 minority apprentices for the 1973 Apprenticeship class under paragraph 8

of the Interim Decree entered by this Court on May 9, 1973.

### List "B"

| | |
|---|---|
| Michael Barrett | William Lugo |
| Carl Boyd | Ezekiel Maxey |
| John Bryant | Michael Mitchell |
| Miguel Cardona | Nelson Moore, Jr. |
| Wilfredo Cardona | Arthur Rogers |
| Rufus Daniels | Robert Salter |
| James Dyer | Vaughan Scott |
| Nathan Gallup | Kenneth Shearin |
| Herbert Hogans | Samuel Smith |
| Claborn Hudson | Archie Troy |
| Earl Jones | John Whitley |
| Eugene Jones | Henry Williams |
| Thomas Lollis | |

It is hereby further ordered, adjudged, and decreed that the consent decree submitted and signed by the parties shall be annexed hereto and incorporated herein as the decree of this court, and that the consent decree along with the provisions for specific relief ordered herein shall constitute the full and final relief in this Electricians Cluster, and that no award of back[3] pay and no proceedings thereto shall be permitted. No costs.

---

3. To preserve numerical continuity, the decision as to back pay will be incorporated as paragraph 29 of the Decree as follows:

"29. No back pay shall be allowed or paid for the reasons expressed in this Court's Supplementary Opinion and Final Order filed August 20, 1973."