**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**IRONWORKERS LOCAL 86 et al.,**
**Defendants-Appellants.**

**No. 26048.**

United States Court of Appeals,
Ninth Circuit.

May 17, 1971.

---

Hugh Hafer (argued), John E. Rinehart, Jr., of Bassett, Donaldson & Hafer, Seattle, Wash., Harold Stern, Gen. Counsel, Ironworkers International Union, New York City, Donald Fisher, Gen. Counsel, Sheet Metal Workers International Union, Toledo, Ohio, Martin F. O'Donoghue, Gen. Counsel, Plumbers & Pipefitters International Union, Washington, D. C., for defendants-appellants.

Frank Petramalo, Jr. (argued), David L. Rose, Robert T. Moore, Attys., Dept. of Justice, Washington, D. C., Jerris Leonard, Asst. Atty. Gen., Stan Pitkin, U. S. Atty., Seattle, Wash., Herman Siqueland, Duane Vance, Don Davidson, Alec Brindle, Seattle, Wash., for plaintiff-appellee.

Before HAMLIN and MERRILL, Circuit Judges, and HILL, District Judge.[*]

HAMLIN, Circuit Judge:

On October 31, 1969, the Attorney General of the United States [1] brought an action in the United States District Court for the Western District of Washington against five building construction unions [2] located in Seattle, Washington, and three joint apprenticeship and training committees associated with them.[3] The complaint alleged that the named unions and joint apprenticeship and training committees had denied employment opportunities to blacks on account of their race and that certain policies, practices and conduct, described therein, constituted a "pattern or practice" of resistance to full employment of blacks in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e et seq. The district court, William J. Lindberg, Chief Judge, found that all the named unions and joint apprenticeship and training committees had pursued a pattern or practice of conduct which denied blacks, on account of their race, equal employment opportunities in the construction industry; two judgments and decrees followed.[4] All but one of the defendants [5] have joined in the instant appeal.[6] We affirm.

---

[*] Honorable Irving Hill, United States District Judge, Central District of California, sitting by designation.

1. 42 U.S.C. § 2000e–6(a) reads:
   Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action * * * requesting such relief, including an application for a permanent injunction or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice. * * *

2. Local 86, International Association of Bridge, Structural, and Ornamental Ironworkers (hereinafter Ironworkers Local 86) ; Local 46, International Brotherhood of Electrical Workers (hereinafter Electrical Workers Local 46) ; Local 32, United Association of the Plumbing and Pipefitting Industry of the United States (hereinafter Plumbers and Pipefitters Local 32) ; Local 302, International Union of Operating Engineers (hereinafter Operating Engineers Local 32) ; Local 99, International Sheet Metal Workers Association (hereinafter Sheet Metal Workers Local 99).

3. Ironworkers Joint Apprenticeship and Training Committee (hereinafter Ironworkers JATC) ; Plumbers and Pipefitters Joint Apprenticeship and Training Committee (hereinafter Plumbers and Pipefitters JATC); Sheet Metal Workers Joint Apprenticeship and Training Committee (hereinafter Sheet Metal Workers JATC).

4. Judge Lindberg's opinion is reported at 315 F.Supp. 1202 (W.D.Wash.1970).

5. Operating Engineers Local 32 was party to a consent decree and thus did not join in the appeal. The Ironworkers JATC chose not to join in the appeal and were represented by other counsel.

6. After the court found that the unions and the joint apprenticeship and training committees had engaged in a pattern or practice of discrimination, the court, desiring to structure proper and effective relief, ordered the parties (Electrical Workers Local 46, defendant contractor associations and the United States) to "take all steps available to persuade

Many of the basic facts were largely undisputed and were stipulated by the parties. Appellant building trades unions are labor organizations which represent a large number of workmen employed in the construction industry in and about Seattle, Washington.[7] Through the union hiring halls, appellant unions effectively control a large percentage of the employment opportunities in the construction industry in that area. Under the bargaining agreements entered into between the contractor-employers and the unions, the unions must be given first opportunity to fill positions. Contractors may not employ non-union workers unless the positions are not filled by the unions within a period of time stipulated under the bargaining agreement.

The joint apprenticeship and training committees who join in this appeal are entities legally separate and distinct from the specific unions with which they are associated. The committees consist of members representing both the unions and the employers,[8] and are formed to oversee and run the apprenticeship programs whose purpose is to train apprentices to become journeymen in the respective trades. Once an applicant is accepted into the program,[9] he becomes indentured to the joint apprenticeship and training committee for a period of years[10] and participates in a program which consists of both on-the-job training and classroom instruction. It is through this program that participants gain admission to the union as a journeyman, thereby obviating the necessity of taking the avenue of direct admission which demands that an applicant meet certain requirements such as possessing a specified number of years of experience, being within a given age range, having letters of recommendation, and passing a journeyman's examination.

or require" the Electrical Workers Joint Apprenticeship and Training Committee (hereinafter Electrical Workers JATC) to intervene for purposes of relief in respect to conduct of the apprenticeship program. The court specifically noted that it did not intend to find or imply that the Electrical Workers JATC had discriminated against blacks, but entered the order *so as to* impart "uniformity in procedures relative to the J.A.T.C.'s connected with the respective defendant unions found to have discriminated." While appellants take exception to this order, we see no error in the court requesting the full cooperation of the defendants in structuring appropriate relief.

7. More specifically, the court found that the unions had the following membership: Iron Workers Local 86, approximately 920 members; Plumbers and Pipefitters Local 32, approximately 1900 members; Electrical Workers Local 46, approximately 1750 members; Sheet Metal Workers Local 99, approximately 900 members.

8. The Plumbers and Pipefitters JATC is comprised of five representatives of Local 32, and three representatives of the Seattle Plumbing and Pipefitting Employers, one representative of the Refrigeration Contractors' Association and one member from the Puget Sound Shipbuilders Association. As for the Sheet Metal Workers JATC, the other committee joining in this appeal, it is comprised of eight members, four representatives of Local 99 and four representatives of contractors party to a collective bargaining agreement.

9. The Sheet Metal Workers JATC provides an example of the process leading to acceptance into an apprenticeship program. An applicant must be between the ages of 18 to 24 (excluding time spent in the military service), pass a GATB aptitude test, complete an application form and submit a high school transcript before he is considered. Preference is given to high school graduates. Assuming these threshold requirements are met, thereby allowing the applicant the right to be considered by the committee, he is then interviewed in order to evaluate his qualifications and the committee then votes whether to accept him or not. The chairman of the Sheet Metal Workers JATC indicated that they "will more or less look favorably on an individual who has family members who are sheet metal workers."

10. The period of indenture differs between the appellant committees: Plumbers and Pipefitters JATC (five years), Sheet Metal Workers JATC (four years).

The court found appellant unions and joint apprenticeship and training committees to have engaged in a pattern or practice of discrimination which denied blacks employment opportunities in the construction industry. It based its conclusions on specific findings of discrimination which included (1) the employment of tests and admission criteria which had little or no relation to on-the-job skills and which had a differential impact upon blacks, and which operated to exclude them from entrance into the unions or referrals to available jobs; (2) the active recruitment of whites while at the same time giving little or no publicity to information concerning procedures for gaining union membership, work referral opportunities, and the operation of the apprenticeship training programs in the black community; (3) the granting of preferential treatment to friends and relatives of existing members of the unions; and (4) the differential application of admission requirements, often by-passing such requirements in cases of white applicants. In addition, several instances were shown where black workers who sought referrals were turned away without reason or after being given a spurious reason in support of its action; and in some cases, unions refused to place blacks on the referral lists, thus assuring their inability to secure work.

The relief granted by the court took the form of two judgments and decrees: the first related to the unions and the second related to the joint apprenticeship and training committees. In the first, the court enjoined the unions from engaging in future discrimination with respect to referrals for employment and the acquisition or retention of union membership. It ordered that the unions keep detailed records of their operations and actively disseminate information in the black community describing the operation of the referral systems, membership requirements and available job opportunities. Specific relief was granted by the court to certain individuals or groups of persons, ordering the unions to offer them immediate construction referrals in response to the next contractor requests for workers and to open their membership application lists to these persons. The court retained jurisdiction for such further relief as it deems necessary or appropriate to further effectuate equal employment opportunities.

Judgment and Decree No. 2 pertained to the joint apprenticeship and training committees. The committees were enjoined from all future discrimination against applicants for apprenticeship on account of their race. It further ordered the committees to disseminate information concerning the requirements and procedures for admission to the apprenticeship programs so as to apprise blacks within the geographical area of available opportunities. The respective committees were ordered to consider all applicants who met the standards set out by the court in the decree. In addition to the above, an affirmative action program was included in the decree in the hope of eradicating the vestiges of past discrimination. Among the provisions under this program were the creation of special apprenticeship programs designed to meet the special needs of average blacks with no previous experience or special skills in the trade, or black applicants who have some previous experience or special skills in the trade but do not meet journeymen standards. The court also retained jurisdiction over the committees in order to grant such further relief as it deems necessary.

## I. FINDINGS OF FACT

We are confronted initially with the appellants' contention that the "clearly erroneous" rule [11] should not govern our review of the findings of fact made by the district court. They reason that the rationale underlying the rule is that an appellate court should defer to the judg-

---

11. *See* Fed.R.Civ.P. 52(a).

ment of the trial court because the trial judge had access to demeanor evidence and could readily assess the credibility of the witnesses. Hence, where, as they allege, "large reliance" is placed upon written instruments and depositions, they claim the rule does not apply as demeanor evidence played a small part in the trial judge's decision.

■■ Appellants' characterization of the proceeding below as one in which the trial judge placed "large reliance" on documentary evidence and depositions ignores the fact that over fifty-five witnesses testified, many of whom were deponents prior to trial. Even if "large reliance" was placed on written evidence, the clearly erroneous rule would still apply. We examined this problem in Lundgren v. Freeman, 307 F.2d 104 (9th Cir. 1962), and found the better rule to be that the clearly erroneous rule does apply, even where the factual issues are decided on written evidence alone.[12] Appellants would have us review the evidence *de novo* and freely substitute our judgment for that of the trial judge. We decline to do so. The well-established rule is that we "may not substitute our judgment if conflicting inferences may be drawn from established facts by reasonable men, and the inferences drawn by the trial court are those which could have been drawn by reasonable men." *Lundgren, supra,* 307 F.2d at 113. *See also* Jacobson v. Colorado Fuel and Iron Corp., 409 F.2d 1263, 1267 (9th Cir. 1969); Friend v. H. A. Friend & Co., 416 F.2d 526, 531 (9th Cir. 1969); United States v. Hanna Nickel Smelting Co., 400 F.2d 944, 947 (9th Cir. 1968).

■ Appellants further contend that the district court's findings were based on evidence which it had previously ex-cluded. Prior to trial, the Attorney General examined the application forms found in the files of the joint apprenticeship and training committees. At trial, appellants objected to the introduction of charts which were made from information found in the application forms on the ground that they did not qualify for admission under the business records exception to the hearsay rule.[13] The court, sustaining, in part, appellants' objection, held this evidence was inadmissible to prove the truth of the matters contained therein, but was admissible as evidence of the type of information sought by the committees and relied upon by them in reaching their evaluative decisions.

The contention of appellants is unsupportable, given the limited purpose for which the information contained in the applications was used. As we noted in Phillips v. United States, 356 F.2d 297, 307 (9th Cir. 1965), cert. denied, 384 U. S. 952, 86 S.Ct. 1573, 16 L.Ed.2d 548 (1966), where a similar argument was raised:

> The purpose of that section [Business Records Act, 28 U.S.C. § 1732, as amended, 28 U.S.C. § 1732 (Supp. IV 1961)] is to provide, in the case of business records, an exception to the hearsay rule, and to provide an acceptable substitute for specific authentication of each business record. We are not here concerned with the hearsay rule because the letters and requests contained in exhibits 968 and 984 were not offered in proof of the statements contained therein. They were introduced only to show defendants had knowledge that such statements had been made. Nor are we concerned with authentication since the authenticity of the documents need

---

12. A number of courts have held that in cases where the findings are based on documentary evidence, on uncontradicted testimony, on stipulated facts, or on testimony taken by depositions, the trial court's findings are given only slight weight on appeal. *See, e. g.,* Galena Oaks Corp. v. Scofield, 218 F.2d 217 (5th Cir. 1954); Hart v. Gallis, 275 F.2d 297 (7th Cir. 1960). *See generally,* 5 J. Moore, Federal Practice ¶ 52.04 (2d ed. 1959).

13. 28 U.S.C. § 1732, as amended, 28 U.S.C. § 1732 (Supp. IV 1961).

not be established where the only purpose of the documents is to show notice.

*Accord*: United States v. Middlebrooks, 431 F.2d 299, 301 (5th Cir. 1970). As in *Phillips, supra,* the information contained in the applications was not proferred to prove the statements therein, but to show what information was sought by the apprenticeship committees in the applications and relied upon by them in making their decisions. The application form information was properly admitted for this purpose.

The district judge's duty was to consider the evidence, reach all reasonable inferences therefrom, and make specific findings of fact and conclusions of law. This task was necessarily a difficult one and involved the review of extensive oral testimony, many depositions and a great amount of accompanying documentary evidence. Its proportions are reflected in the size of the reporter's transcript which alone numbers twenty volumes. In his carefully written and excellent opinion, covering some fifty pages, Judge Lindberg made separate findings of fact as to each party, carefully analyzing the supportive evidence found in the record. In these findings of fact Judge Lindberg has pointed out by page reference to the record, the testimony, stipulations, admitted facts, and exhibits upon which his findings were based. It would serve no purpose to repeat such references in this opinion. It is not our duty to relitigate the facts at this time. Having reviewed the findings below and the record before us, we are fully convinced that the findings are amply supported by the evidence.

## II. CONCLUSIONS OF LAW

At the outset, appellants contest the use of racial statistics to prove a "pattern or practice" of discrimination as a matter of law. They categorize this mode of proof as a statistical "numbers game", incapable of proving a violation of Title VII. We believe this argument is without support as the use of statistics is well established in recent Title VII cases.[14]

In the district court's opinion, a separate statement was made as to each appellant concerning the racial composition of its membership. As to appellate unions, it was stated: Ironworkers Local 86 had approximately 920 members in January 1970, only one of whom was black,[15] Sheet Metal Workers Local 99 had approximately 900 members in its construction division, only one of whom was black;[16] and Plumbers and Pipefitters Local 32 had approximately 1900 members in its construction classifications, only one of whom was black.[17] In addition, with respect to the appellant joint apprenticeship and training committees, the court noted: Sheet Metal Workers JATC had 100 apprentices indentured in its program and seven were black;[18] Plumbers and Pipefitters

14. The reliance upon statistical evidence to prove discriminatory practices is not new to the courts. *See, e. g.,* Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); Patton v. Mississippi, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76 (1947); Hill v. Texas, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942); Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935) (jury selection cases); F. W. Woolworth Co., 25 NLRB 1362 (1940) (anti-union discrimination case). *See generally,* Fiss, A Theory of Fair Employment Laws, 38 U.Chi.L.Rev. 235 (1971).

15. The black was Howard Lewis, who was admitted on September 12, 1969, pursuant to an order of the Washington State Board Against Discrimination.

16. His name was Leonard O'Neale, a member of Local 99 since the summer of 1968.

17. He was David Williams, a welder, who was accepted in a period where there was an acute shortage of welders, forcing Local 32 to recruit from the Boilermakers' Union.

18. Five were accepted after September, 1969, and the remaining two were accepted in May, 1968.

JATC had 104 building trades apprentices and none were black.

The district court also made a specific finding applicable to all parties concerning the racial composition of the City of Seattle where the main offices, hiring halls and training facilities of the appellants are found. Approximately 42,000 blacks reside in the City, constituting roughly seven percent of the population. This information came from an expert witness, a demographer, called to testify by the Attorney General.[19]

Since the passage of the Civil Rights Act of 1964,[20] the courts have frequently relied upon statistical evidence to prove a violation. This judicial practice has most often taken the form of the use of such data as a basis for allocating the burden of proof. On the basis that a showing of an absence or a small black union membership in a demographic area containing a substantial number of black workers raises an inference that the racial imbalance is the result of discrimination, the burden of going forward and the burden of persuasion is shifted to the accused, for such a showing is enough to establish a *prima facie* case.[21] In many cases the only available avenue of proof is the use of racial statistics to uncover clandestine and covert discrimination by the employer or union involved. One court, in Parham v. Southwestern Bell Telephone Co.,

433 F.2d 421, 426 (8th Cir. 1970), held as a matter of law, without other supportive evidence, that the statistics introduced showing an extraordinarily small number of black employees, notwithstanding a small number who held menial jobs, established a violation of Title VII. Of course, as is the case with all statistics, their use is conditioned by the existence of proper supportive facts[22] and the absence of variables which would undermine the reasonableness of the inference of discrimination which is drawn. It is our belief that the often-cited aphorism, "statistics often tell much and Courts listen," [23] has particular application in Title VII cases.

Here, even if we were to accept appellant's assertion that statistics alone cannot show as a matter of law that there has been a violation, it would not command our overturning of the conclusions of law reached by the district court. We are not faced with a situation where a court has relied upon statistical data alone. On the contrary, in its findings, the district court cited specific instances of discrimination on the part of the unions and apprenticeship committees. Thus the statistical evidence is complementary rather than exclusive. We see no merit in appellants' complaint regarding the use of statistics.

Appellants next argue that the conclusions reached by the court that appel-

---

19. Aside from their castigation of the use of such information as an engagement in a statistical "numbers game," appellants further contend that this data is irrelevant as the appellants' jurisdiction extends beyond the City of Seattle, rendering such statistics misleading. This is simply answered by the fact that the City has the single largest population within their jurisdiction and is that area from which they would most likely draw the vast majority of workers for apprenticeship, referral and membership purposes. We also recognize that appellants made no objection to this testimony at trial. We feel appellants' argument has no merit.

20. Title VII of the Civil Rights Act of 1964 took effect on July 2, 1965.

21. *See, e. g.,* United States v. Local 38, IBEW, 428 F.2d 144, 151 (6th Cir. 1970); EEOC v. United Association of Journeymen, etc., 311 F.Supp. 468 (S.D. Ohio 1970); United States ex rel. Mitchell v. Hayes Int'l Corp., 415 F.2d 1038 (5th Cir. 1969); United States v. Sheet Metal Workers Local 36, 416 F.2d 123 (8th Cir. 1969).

22. Fiss, *supra* note 14, at 272–73. *See also* Note, Enforcement of Fair Employment Under the Civil Rights Act of 1964, 32 U.Chi.L.Rev. 430, 461 (1965).

23. State of Alabama v. United States, 304 F.2d 583, 586 (5th Cir.), aff'd per curiam, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962).

lants engaged separately in a "pattern or practice of resistance" are wholly unsupportable. They equate the phrase "pattern or practice" with "uniformly engaged in a course of conduct aimed at denying rights secured by the Act." We feel that such an interpretation is overly restrictive and does violence to the meaning intended by Congress to be accorded the phrase. Moreover, it is our firm belief that the conclusions reached by the district court are not clearly erroneous and must be affirmed.

The phrase is not defined in Title VII, but some guidance is offered by an examination of the legislative history of this and other Civil Rights Acts employing the same words. Commenting on the meaning to be accorded the phrase in the debates on the Civil Rights Act of 1964, Senator Humphrey stated:

> * * * Such a pattern or practice would be present only where the denial of rights consists of something more than an isolated, sporadic incident, but is repeated, routine or of a generalized nature.[24]

In testimony before the House Judiciary Committee on the Civil Rights Act of 1960,[25] Deputy Attorney General Walsh said:

> Pattern or practice have their generic meanings. In other words, the court finds that the discrimination was not an isolated or accidental or peculiar event; that it was an event which happened in the regular procedures followed by the state officials concerned.[26]

In United States v. Mayton, 335 F.2d 153, 158 (5th Cir. 1964), an action under the Civil Rights Act of 1960, in which the court found that racial discrimination in the voter registration process was pursuant to a "pattern or practice", the court addressed itself to defining the words and concluded that they "were not intended to be words of art." See also United States v. Ramsey, 331 F.2d 824, 837 (5th Cir. 1964) (Judge Rivas, concurring and dissenting in part). With respect to the phrase, Senator Keating commented that "[t]he 'pattern or practice' requirement means only that the proven discriminatory conduct of defendants was not merely an isolated instance of racial discrimination." 106 Cong.Rec. 7767.

■■ We are firmly convinced that it was the intent of Congress that a "pattern or practice" be found where the acts of discrimination are not "isolated, peculiar or accidental" events. The words were not intended to be words of art. Applying this definition in the instant case, we are compelled to concur with the district court's findings that appellants engaged in a "pattern or practice" of discrimination. The findings are well documented with statistical evidence showing a distinct absence of black membership in the unions and the apprenticeship programs; the failure of the union hiring halls to grant blacks referrals; many overt acts of discrimination on the part of appellants; and many facially neutral employment practices which had a differential effect upon blacks. We are not concerned with isolated or accidental acts by appellants but a "pattern or practice" of resistance by them which has had an effect of denying black workers equal job opportunities in the Seattle area.

Therefore, we hold that the conclusions reached by the district court finding appellant unions and joint apprenticeship and training committees to have engaged in a pattern or practice of discriminatory conduct with respect to employment opportunities in the construction industry are not clearly erroneous.

### III.  RELIEF GRANTED

■ Appellants finally contend that the district court violated section 703(j)

---

24. 110 Cong.Rec. 14270.

25. 42 U.S.C. § 1971(e).

26. Hearings Before the House Committee on the Judiciary on H.R. 1037, 86th Cong., 2nd Sess. 13.

of the Act [27] in ordering appellant unions to offer immediate job referrals to previous discriminatees, and ordering appellant apprenticeship and training committees to select and indenture sufficient black applicants to overcome past discrimination, and to also meet judicially imposed ceiling requirements in apprenticeship program participation. This they condemn as "racial quotas" and "racial preferences." We cannot agree.

The Act vests in the Attorney General and the trial court power to eliminate both the vestiges of past discrimination and terminate present discriminatory practices. Under sections 706(g) [28] and 707(a) [29], unlawful employment practices may be enjoined by the court and such affirmative relief granted as the court may deem appropriate. The only statutory limitation on the availability of relief is the anti-preferential treatment provision of section 703(j).

There can be little doubt that where a violation of Title VII is found, the court is vested with broad remedial power to remove the vestiges of past discrimination and eliminate present and assure the non-existence of future barriers to the full enjoyment of equal job opportunities by qualified black workers. Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 427 (8th Cir. 1970); United States v. International Brotherhood of Electrical Workers, No. 38, 428 F.2d 144, 151 (6th Cir. 1970); Local 53 of International Association of Heat and Frost Insulators and Asbestos Workers v. Vogler, 407 F.2d 1047, 1052–1053 (5th Cir. 1969); United States ex rel. Mitchell v. Hayes International Corp., 415 F. 2d 1038, 1039 (5th Cir. 1969). *Cf.*

Swann v. Charlotte-Mecklenberg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (April 20, 1971). On the basis of this broad equitable power, the courts have allowed a wide range of remedial relief. *See, e. g., Electrical Workers Local 38, supra* (remand to district court with direction to fashion appropriate affirmative relief); *Parham, supra,* (remand to the district court with directions to retain jurisdiction to assure compliance); Griggs v. Duke Power Co., 420 F.2d 1225 (4th Cir. 1970), rev'd 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (March 8, 1971) (immediate work referral or union membership); *Hayes International Corporation, supra* (preliminary injunction); *Sheet Metal Workers Local 36, supra* (publication of the fact that membership and related benefits were open to all persons and an affirmative duty of minority recruitment); United States ex rel. Mitchell v. United Association etc. Plumbers Local 73, 314 F.Supp. 160 (S.D.Ind. 1969) (revamping of apprenticeship program). Without such powers, the district court would be unable to effectuate the desire of Congress to eliminate all forms of discrimination.

In *Vogler, supra,* 407 F.2d at 1053–1055, the district court ordered, in addition to an injunction against future discrimination and the immediate admission of four discriminatees, that the union develop objective criteria for membership and union size. As here, it was contended that the order established a "quota system to correct racial imbalance in violation of section 703(j)." Rejecting this argument, the court held the district court did "no more than ensure that the injunction against further ra-

---

**27.** 42 U.S.C. § 2000e–2(j). It provides:
  Nothing contained in this title shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this title to grant preferential treatment to any individual or to any group because of race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist * * *.

**28.** 42 U.S.C. § 2000e–5(g) reads:
  If the court finds that the respondent has intentionally engaged in or is engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative relief as may be appropriate. * * *

**29.** See note 1 *supra.*

cial discrimination would be fairly administered." *Id.* at 1054. The *Vogler* court succinctly stated that "where necessary to insure compliance with the Act, the District Court was fully impowered to eliminate the present effects of past discrimination." Similarly, in International Brotherhood of Electrial Workers, Local No. 38, *supra*, 428 F.2d at 149, the court felt that such an interpretation of section 703(j) "would allow a complete nullification of the purposes of the Civil Rights Act of 1964."

We therefore reject appellants' contention. The district court neither abused its discretion in ordering the affirmative relief, nor did it in any way establish a system of "racial quotas" or "preferences'" in violation of section 703(j).

The judgment of the district court is affirmed.