525 F.2d 1318
 11 Fair Empl.Prac.Cas. 787,
10 Empl. Prac. Dec. P 10,503
UNITED STATES of America, Plaintiff-Appellee,
v.
NAVAJO FREIGHT LINES, INC., et al., Defendants,
International Brotherhood of Teamsters, Chauffeurs,
Warehousemen and Helpers of America, Defendant-Appellant.
 No. 73--2764.
 United States Court of Appeals,
Ninth Circuit.
 Nov. 5, 1975.
 
 Julius Reich (argued), of Brundage, Neyhart, Miller, Reich & Pappy, Los Angeles, Cal., for defendant-appellant.
 Francis A. Cronin (argued), U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.
 OPINION
 Before WRIGHT and SNEED, Circuit Judges, and POWELL,* District Judge.
 SNEED, Circuit Judge:
 
 
 1
 This is another Title VII case pertaining to the trucking industry[1] in this instance initiated by the Attorney General. It was commenced on January 18, 1972 against Navajo Freight Lines, Inc., International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Teamsters), and the International Association of Machinists and Aerospace Workers (Machinists) to enforce Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and Executive Order 11246. The complaint alleged that 'Navajo has pursued and continues to pursue policies and practices that discriminate against blacks and persons of Mexican origin . . . which deprive or tend to deprive them of employment opportunities or adversely affect their status as employees because of their race, color or national origin.' (Par. 11) Such 'policies and practices', it was alleged in the complaint, were present in those pertaining to recruiting, hiring, promoting, assigning, and transferring.
 
 
 2
 On February 7, 1972 a consent decree was entered into by the Government, Navajo and the Machinists which later was supplemented by a consent decree between the Government, Navajo and the Teamsters entered on January 15, 1973. The effect of these two decrees was to settle all differences between the Government and the Machinists and to leave unresolved only the issues whether Navajo's system of 'classification seniority' was unlawful under Title VII and, if so, what modifications were necessary to achieve compliance with Title VII. Prior to entering the January 15, 1973 consent decree, the Teamsters moved for summary judgment on the ground that it, as the International, was not a proper party to the suit and that the Local Unions were indispensable parties under Rule 19, Fed.R.Civ.P. The motion was denied by the trial court on July 6, 1972.
 
 
 3
 The unresolved issues were tried primarily on stipulated facts and the trial court filed its findings of fact, conclusions of law, and order on June 6, 1973. These supported the position of the Government. Only the Teamsters filed a timely notice of appeal. Fundamentally, only two issues are raised by the Teamsters' appeal, viz., was their motion for summary judgment improperly denied and was the trial court's modification of the seniority structure applicable to employees of Navajo proper. We hold that the trial court was correct in denying the Teamsters' motion for summary judgment and its modification of the seniority structure was erroneous only in that it failed to properly consider the seniority rights of non-minority road drivers who lost terminal seniority when they transferred to an over-the-road driving job.
 
 I.
 
 4
 Teamsters' Motion For Summary Judgment.
 
 
 5
 To understand the position of the Teamsters with respect to its motion for summary judgment it is necessary to describe briefly certain features of the constitutional structure of the Teamsters and the manner in which collective bargaining is conducted under that structure.
 
 
 6
 The Teamsters is, in the language of the Preamble to its Constitution and By-laws, 'one great labor organization.' It consists of 'an unlimited number of Local Unions' (Art. 1, Sec. 1, Constitution and By-laws) and is open to membership to 'any person' (Art. 11, Sec. 2(a)) subject to certain exceptions. The Constitution and By-laws authorize the existence of Area Conferences (Art. XVI, Sec. 1) and 'subordinate bodies' (e.g., Art. VI, Sec. 1(f); Art. X, Sec. 4 and 10(a)). Local Unions, area conferences, and subordinate bodies are entitled to many rights and immunities and subject to many duties and liabilities by reason of particular provisions of the Constitution and By-laws.[2] The powers of the General President are extensive and in various respects touch on matters relating to Local Unions. E.g., Art. VI, Sec. 5, pertaining to power to subject Local Unions to trusteeships. Such powers not delegated to the General President or General Secretary-Treasurer belong to the General Executive Board. Art. IX, Sec. 1. The picture that emerges from an examination of the Teamsters Constitution is one of a strongly centralized union that has secured itself against the weaknesses that attend confederations.
 
 
 7
 The bargaining process and the structure of collective agreements within the trucking industry also reflect these characteristics. Thus, the National Master Freight Agreement (NMFA) is negotiated with much of the trucking industry by a union negotiating committee which is appointed by the General President of the Teamsters. The president is also the chairman of this committee and at least seven of the committee's fourteen members are officers or employees of the Teamsters. Concurrently with the negotiation of the NMFA there is negotiated area of regional Supplemental Agreements in which the seniority methods and procedures, as are involved in this case, are set forth. While a majority of Local Unions must vote for such national and regional negotiation (Constitution and By-laws, Art. XVI, Sec. 4(a)), NMFA and the Supplemental Agreements are approved by 'a majority of the votes cast by local union members voting . . .' (Ibid.). Following approval in this manner the Local Unions sign NMFA and the Supplemental Agreements while Teamsters does not. Such signing appears to be largely ministerial because under the Constitution the agreements are binding following approval. (Constitution and By-laws, Art. XVI, Sec. 4(a)). This process and structure has been thoroughly described in Rodriguez v. East Texas Motor Freight, 505 F.2d 40 (5th Cir. 1974) and Sagers v. Yellow Freight System, Inc., 58 F.R.D. 54 (N.D.Ga.1972).
 
 
 8
 Teamsters, in its motion for summary judgment, contended that because it neither discriminated nor signed the pertinent agreements it was not a proper party and that the locals were indispensable parties under Rule 19, Fed.R.Civ.P. The trial court's finding that Teamsters played a 'vital role' in negotiations of NMFA and the Supplemental Agreements is unquestionably correct. Any other finding would fly in the face of the constitutional structure and practices of the Teamsters and its local unions.
 
 
 9
 The alleged indispensability of the Local Unions admittedly poses a more difficult issue. Certainly the locals have a substantial interest in any modification of the seniority rights of its members. In the final analysis, it is the rights of these members, who also are members of Teamsters, that will be affected by the trial court's decree. Thus, the question becomes whether the failure to join the Local Unions either (1) prevents complete relief from being accorded among those already parties, or (2) impairs or impedes the ability of the locals or members to protect their rights, or (3) subjects those already parties, the Teamsters, to a substantial risk of multiple liability or otherwise inconsistent obligations. Rule 19, Fed.R.Civ.P. In view of the constitutional relationship between the Teamsters and its local unions and the pattern and structure of negotiations, it cannot be said that the non-joinder of such locals will have any such consequences. Under the circumstances of this case the ability of the locals and members to protect their rights is not impaired by a failure to be joined. Not only has Teamsters aggressively defended the seniority rights of its members in this and other litigation,[3] but it is also true that Teamsters under its Constitution and By-laws has directed that no local union shall 'cause or attempt to cause any employee to discriminate' on the basis of race, color, religion, etc. Thus, Teamsters is concerned with seniority and discrimination, its resources are ample, and its conduct in this and other litigation plainly suggests that neither the locals nor their members can complain that their ability to protect themselves has been impaired by their non-joinder. To hold otherwise is to read Rule 19 in a dryly formal manner entirely divorced from the realities of this case.
 
 
 10
 We do not wish to be understood as holding that in any case involving Title VII or other matters that the local unions need not be joined with the international. In some instances, as where, for example, the interests of the locals conflict sharply with those of the international, the locals may be parties required to be joined by Rule 19. Each case must be evaluated on its own facts. We only hold that in this case such a joinder is not required. Other courts have reached a similar conclusion. See United States v. Pilot Freight Carriers, Inc., 54 F.R.D. 519 (M.D.N.C.1972); Sagers v. Yellow Freight System, Inc., 58 F.R.D. 54. As we have said in construing Rule 19 in another context, a failure to join is not improper when it appears unlikely that the absentees would be adversely affected in a practical sense. Continental Insurance Co. v. Cotten, 427 F.2d 48 (9th Cir. 1970). Such is the case here. Our conclusion is certainly not shaken by the fact that the Local Unions failed to join when given the opportunity to do so by the trial court.II.
 
 The Seniority Remedy
 
 11
 A. The Scope of the Trial Court's Remedy.
 
 
 12
 The trial court in the pertinent part of its conclusions of law, which are set forth in the margin,[4] held (1) that the United States had established a prima facie case of racial discrimination which was unrebutted; (2) that practices, procedures, or tests neutral on their face or in interest cannot be maintained if they operate to perpetuate the effect of prior discriminatory practices; (3) that requirement that all seniority, except for fringe benefit purposes, be surrendered upon qualifying for a road driver position perpetuates past discrimination and is contrary to 42 U.S.C. § 2000e--2(a)(2), which condemns deprivations of employment opportunities because of race; (4) that authority exists to provide 'carryover' seniority for all purposes including bidding and layoff, (5) that the class of employees who suffered because of discrimination, viz. 'all incumbent black and Spanish-surnamed American individuals employed by Navajo prior to February 7, 1972, who were initially assigned to a position other than road driver and who are currently employed at Navajo or on layoff status' (Finding of Fact No. 21) are entitled to seniority carryover for all purposes; and (6) that even though some members of the class may not have assumed road driver positions in the absence of discrimination, all members of the class should be treated alike because 'there is no reasonable method for determining at this late date who these individuals may be.' (Conclusions of Law, C. 3.)
 
 
 13
 Pursuant to these conclusions of law, the trial court in its June 8, 1973 order directed that seniority carryover be provided in the following manner:
 
 
 14
 '5. Members of the affected class who transfer to an over-the-road driving job pursuant to this Order or have previously transferred shall carry their terminal seniority for all bidding purposes and company seniority for fringe benefit purposes. They shall be slotted in based on their terminal seniority so that they establish their 'rightful place' on the road driver seniority roster.
 
 
 15
 All members of the affected class who transfer to an over-the-road position shall have a 30-day probationary period during which they shall have the right to return to their old job without loss of seniority if they do not wish to continue driving. Such a return shall be a rejection within the meaning of Paragraph 4.'
 
 
 16
 This Order did not displace any non-minority road driver from his existing position. It merely established an orderly method by which members of the discriminatee class could apply and qualify for road driver positions 'when vacancies occur.' Navajo was permitted to continue to employ its driving performance test subject to certain conditions designed to insure that it was used in a nondiscriminatory manner. Navajo also was directed to report periodically to the trial court the identity of those discriminatees who availed themselves of the opportunity to transfer to a road driver position. Jurisdiction was retained by the trial court to oversee the implementation of its decree.
 
 
 17
 Teamsters insist that the trial court under Civil Rights Act § 706(g), 42 U.S.C. § 2000e--5(g), which empowers the court to 'order such affirmative action as may be appropriate . . .', should have required the proof of a specific act of discrimination against specific members of the affected class and seniority carryover should date only from the date of discrimination. As the Teamsters put it in their brief:
 
 
 18
 'This authority should be limited, however, to correcting the present effects of past discrimination, by granting road seniority to a transferring employee of Navajo, as of the date he (1) either applied for a road job, filed a charge with the Equal Employment Opportunity Commission, or in any other manner demonstrated an interest in becoming a road driver, (2) at a time subsequent to the effective date of the Act (July 2, 1965) when a road vacancy existed, (3) when such applicant had qualifications sufficient for meeting wholly objective and equitable qualification standards, and (4) when a less qualified or less experienced employee of another race was referred over such applicant.'
 
 
 19
 We disagree.
 
 
 20
 B. The Function of 'Rightful Place.'
 
 
 21
 While our position is amply supported by our decision in United States v. Ironworkers, Local 86, 443 F.2d 544 (9th Cir. 1971) and decisions in other circuits,[5] we think it proper to set forth the route we traveled in reaching this destination. As we did in Ironworkers, we started with the proposition that Title VII vests in the Attorney General and the courts the 'power to eliminate both the vestiges of past discrimination and terminate present discriminatory practices.' Id. at 553. While it is universally recognized that there is no way in which the past can be recast so as to make the present and future what they otherwise should have been, we forth-rightly acknowledge that we read Title VII as requiring us in cases involving adjustments of seniority rights to shape available remedies so as to place discriminatees within the employ of the discriminating employer in that employment status which they would have occupied but for the discrimination. We recognize that any compensation to discriminatees comes at the expense of the expectations of at least some of the non-minority incumbents. A balance must be drawn between these conflicting interests. We agree with those circuits which have adopted the notion of 'rightful place' as a guideline to be used in striking the proper balance. 'Rightful place' states that compensation to wronged minorities cannot be obtained at the expense of the jobs of non-minority incumbents, but can be obtained at the expense of certain seniority expectations of such incumbents.[6] It follows that many specific remedies are compatible with 'rightful place.'[7] It is the task of the trial court to choose from among these remedies that solution which under the facts is both fair and consistent with the objectives of Title VII.
 
 
 22
 ' Rightful place' does not require in a Title VII 'pattern and practice' case that we limit the remedy of seniority adjustment to specific individuals who can demonstrate specific acts of discrimination against themselves.[8] A prima facie case, such as was established by the Government here, which is not refuted is sufficient to establish liability and to permit the courts to turn to the task of fashioning a remedy which may include seniority adjustments.
 
 
 23
 Only those remedies which require discharge of incumbents or are contrary to the dictates of 'business necessity' are foreclosed from choice.[9] Neither Navajo nor the Teamsters have sought to demonstrate that business necessity required the rejection of the adjustment adopted by the trial court. Alternatives which are open include those which would permit a discriminatee to carry over seniority from the date he applied for a road driver position, or from the date he took some overt action to protest the discrimination, or from the date he qualified or would have qualified but for the discrimination for a road driver position, or from the date he was employed by the trucking company, or from the date employed at a particular terminal. Other alternatives, including direct adjustment of non-minority seniority, undoubtedly also lie within the broad remedial powers of the court under the authority of Title VII.[10]
 
 
 24
 C. The 'Most Fair' Seniority Adjustment For Discriminatees.
 
 
 25
 It is our view that in cases such as this the most fair seniority adjustment consistent with 'rightful place' is that which permits a carryover from the date the discriminatee would have qualified but for the discrimination. To restrict the carryover to that which would have accrued from the date of application or protest ignores the Biblically recognized claims of the meek, while to extend the carryover to the date of employment by the company or at the terminal accords seniority for periods of work during which qualification possibly would not have existed even in the absence of discrimination. One provides too little carryover, the other too much. A carryover from the date qualification would have occurred achieves the proper balance.
 
 
 26
 Nonetheless we recognize that very frequently fixing this qualification date is not possible. In such a case the court is required to select a substitute date which closely approximates the qualification date. Seniority systems which involve a loss of seniority in moving from one job classification to another, as does the one in this case, make determination of a qualification date exceedingly difficult because it cannot be said with assurance that in the absence of discrimination a discriminatee would have sacrificed his existing seniority and sought qualification for the higher position. Certainly, as we shall make clear in a moment, some non-minority occupants of lower paying positions could have found the seniority loss that qualification for, and transfer to, road driver would entail, a decisive factor in their decision not to seek qualification and transfer. All that can be said with respect to discriminatees is that discrimination primarily and seniority loss to a lesser, but perhaps unknowable, extent contributed to their failure to qualify and transfer. Under these circumstances the action of the trial court in directing that terminal service be carried over by discriminatees who qualify as road drivers is not improper. It is a reasonable substitute for the date a discriminatee would have qualified for road driver but for the discrimination.
 
 
 27
 D. The Position of Non-Minorities.
 
 
 28
 It must be remembered, however, in fashioning remedies to advance the purposes of Title VII, that section 703(j), 42 U.S.C. § 2000e--2(j), precludes a remedy that grants preferential treatment to any individual or group because of race, color, religion, sex, or national origin. This constraint on the broad powers of the court requires that a proposed remedy be examined to ascertain whether a proscribed preference would result. When this remedy is examined by this standard it becomes necessary to consider the effect of the remedy on non-minority road drivers who had terminal seniority which was sacrificed when they chose to become road drivers. Certain minority road drivers which long terminal seniority may be placed ahead of these non-minority drivers even though the combined terminal and road driver seniority of the two is the same. While we are not prepared to say that such a consequence is prohibited by section 703(j), we are prepared to hold that on the basis of the present record the necessity to introduce this large a difference in treatment to achieve the purposes of Title VII is not adequately shown.
 
 
 29
 Non-minority road drivers with terminal service cannot ascribe such service to discrimination. It flowed from lack of qualification for road driver, absence of openings, unwillingness to sacrifice seniority, distaste for the burdens of road driving, and undoubtedly many other reasons. To accord such drivers the full benefit of terminal service would disadvantage minority road drivers embraced within the trial court's decree and extend an undeserved benefit to non-minorities.
 
 
 30
 Nonetheless, those not discriminated against should be required to sacrifice seniority advantages only to the extent necessary to permit discriminatees to achieve their 'rightful place.' Thus, when it is necessary, as it is in this case, to select a reasonable and easily administered substitute date for the date at which minorities would have qualified for, and transferred to, road driver position but for discrimination, it also becomes necessary to examine the effect of that selection on non-minority road drivers. If the use of this reasonable and easily administered substitute date involves too great a sacrifice, the court, to reduce or eliminate the sacrifice, has the power under Title VII to order such changes in the seniority structure as it pertains to non-minorities as may be necessary and feasible. The standard to be employed in this task remains the same as is used in making adjustments in the seniority rights of minorities, viz. 'rightful place.' All road drivers regardless of their race are entitled to their 'rightful place' to the extent feasible. The fact that an indefinite number of non-minorities have jobs as a result of discrimination, lawful or unlawful, against minorities does not require that minority incumbents receive seniority adjustments in excess of those otherwise required by the 'rightful place' standard. On the other hand, such a fact is relevant in determining what 'practical substitute' for 'rightful place' should be selected when the circumstances of the case require such a choice.
 
 
 31
 E. The Limited Remand.
 
 
 32
 The record before us does not enable us to direct that any adjustment be made to the trial court's decree because of these considerations. To attempt to do so on this record would involve us in an uninformed foray into a factual void. Therefore, we approve the remedy adopted by the trial court and direct that it be implemented as promptly as possible. We remand solely for the purpose of permitting the trial court to consider, in the light of the standards and guides established by this opinion, modifications of the seniority rights of these non-minority road drivers who have terminal service equivalent to that for which minority road drivers are given credit by the trial court's decree.
 
 
 33
 In determining whether to make any such modification the trial court should consider the extent, if any, to which the present position of non-minority road drivers is a consequence of discrimination against minorities. The trial court also should consider the number of non-minority road drivers having the relevant terminal service, the number of such drivers who have no such service, as well as the effect of any such modification on their seniority position and the suggestions that might be made by the parties to this suit. It will also be proper for the trial court to consider whether terminal service by non-minorities, if added to road driver seniority to any extent, should be carried over for all purposes. It appears possible, for example, to accord such service seniority for layoff but not for bidding, or vice versa.
 
 
 34
 It must be understood by this limited remand we do not direct that the trial court must modify the existing seniority rights of non-minorities. We merely require that explicit consideration be given to these rights and that this consideration be guided by the views expressed herein. Our reaction, if such should be required, to the consideration here directed must await another day.
 
 
 35
 Affirmed in part and reversed and remanded in part.
 
 
 
 *
 Honorable Charles L. Powell, Senior United States District Judge of the Eastern District of Washington, sitting by designation. Judge Powell, now deceased, participated in the oral argument and thereafter concurred in the decision to affirm the trial court's order as it pertained to the designated class of minorities. Judge Powell's death preceded the preparation of this Opinion
 
 
 [1]
 By Order dated July 8, 1974, the EEOC was substituted as a plaintiff-appellee for the United States with regard to the Title VII aspects of this case. The United States remains a plaintiff-appellee with regard to matters coming under Executive Order 11246
 
 
 [2]
 The Index of the Constitution and By-laws (1971) lists nine entries under the 'Area Conferences' heading, approximately 120 under 'Local Unions', and approximately 35 under 'Subordinate Bodies'. Each heading appears to deal with a matter of substance and does not reflect overindexing
 
 
 [3]
 See, e.g., Rodriguez v. East Texas Motor Freight, 505 F.2d 40 (5th Cir. 1974); Bing v. Roadway Express, 485 F.2d 441 (5th Cir. 1973); Sagers v. Yellow Freight System, Inc., 58 F.R.D. 54 (N.D.Ga.1972); United States v. Pilot Freight Carriers, Inc., 54 F.R.D. 519 (M.D.N.C.1972)
 
 
 [4]
 'B. Discriminatory Practices
 
 
 [1]
 Defendant Navajo, which employs more than 600 over-the-road drivers, never in its history had a black road driver until November 11, 1970; or a Spanish-surnamed road driver until August 6, 1971. These minority individuals were employed only after the United States Postal Service had informed defendant Navajo that the company was being referred to the Department of Justice for prosecution pursuant to Section 209(a)(2) of Executive Order 11246. Between January 1, 1970, and the middle of 1971, Navajo employed 92 additional white road drivers. During this same period, only one black and no Spanish-surnamed Americans were employed. This failure to employ minority road drivers combined with the facts that the company was hiring white road drivers and that a substantial number of minorities sought such jobs establishes a prima facie case of racial discrimination. United States v. Ironworkers, Local 86, 443 F.2d 544 at 551 (9th Cir., 1971), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); Jones v. Lee Way Freight, Inc., 431 F.2d 245, 247 (10th Cir., 1970) cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237; Bing v. Roadway Express, Inc., 444 F.2d 687, 689 (5th Cir., 1971); Witherspoon v. Mercury Freight Lines, Inc., 457 F.2d 496, 498 (5th Cir., 1972); United States v. Hayes Int'l Corp., 456 F.2d 112, 120 (5th Cir., 1972); United States v. Central Motor Lines, 338 F.Supp. 532, 556 (W.D.N.C., 1971)
 
 
 [2]
 Neither defendant contests the fact that Navajo did not consider, hire or allow transfer of blacks and Spanish-surnamed Americans for road driver positions on the same basis as whites until February 7, 1972, the date that a Consent Decree was signed concerning certain issues in this case (Pre-Trial Order, $ V.1). Therefore, the prima facie case against Navajo stands unrebutted
 
 
 [3]
 Title VII of the Civil Rights Act of 1964 was designed 'to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees. Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices.' Griggs v. Duke Power Co., 401 U.S. 424, 429--430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971)
 
 
 [4]
 Where a company in the past has operated a system of employment in which assignments to particular job classifications were restricted on the basis of race or national origin, the continued reliance on a seniority system which requires an employee to give up his seniority for all purposes except fringe benefits if he transfers to a traditionally white job classification (i.e., road drivers) covered by another collective bargaining agreement perpetuates the effects of past discrimination and constitutes a present pattern or practice of discrimination against black and Spanish-surnamed American employees, depriving them of employment opportunities and adversely affecting their status as employees because of their race or national origin within the meaning of 42 U.S.C. § 2000e--2(a)(2). Local 189, United Papermakers v. United States, 416 F.2d 980 (5th Cir., 1969), cert. denied 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100; United States v. Jacksonville Terminal Co., 451 F.2d 418 (5th Cir., 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972); United States v. Bethlehem Steel Corp., 446 F.2d 652 (2nd Cir., 1971); Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir., 1971); United States v. Central Motor Lines, Inc., supra
 
 
 [5]
 The current collective bargaining agreements do not make provision for incumbent black and Spanish-surnamed American employees, assigned to their jobs on the basis of race or national origin, to transfer to the traditionally white job of road driver with seniority retention for bidding and layoff purposes. To the extent that these agreements prohibit such seniority retention by incumbent black and Spanish-surnamed American employees, they constitute deterrents to transfer in violation of Title VII. The Court has the authority to order the company to discontinue the policy or practice of refusing to permit black and Spanish-surnamed American employees from transferring to the job of road driver and taking with them their seniority for all purposes including bidding and layoff. Similar relief has been consistently ordered in this and other industries where such past discriminatory practices have been found to continue to operate in the present because of seniority provisions. United States v. Central Motor Lines, supra (trucking industry); United States v. Jacksonville Terminal Co., supra (railroad industry); United States v. Chesapeake and Ohio Ry. Co., 471 F.2d 582 (4th Cir., 1972) (railroad industry); Local 189, United Paperworkers v. United States, supra (paper industry); Robinson v. Lorillard Corp., supra (tobacco industry); United States v. Bethlehem Steel Corp. (steel industry); Griggs v. Duke Power Co., supra (electric power industry); Clark v. American Marine Corp., 304 F.Supp. 603 (E.D.La., 1969) (engine manufacturing industry); Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va., 1968) (tobacco industry)
 'C. Relief
 
 
 [1]
 In actions such as this, where a pattern or practice of discrimination is shown in violation of Title VII, the Court has not merely the authority, but the duty, to order affirmative relief to prevent insofar as possible the effects of past discrimination from being carried forward into the future. Local 53, Asbestos workers v. Vogler, 407 F.2d 1047, 1052 (5th Cir., 1969); United States v. Jacksonville Terminal, supra, 451 F.2d at 458; United States v. Central Motor Lines, Inc., supra, 338 F.Supp. at 560
 
 
 [2]
 The scope of the class of employees who have suffered from discrimination on the grounds of race or national origin in initial job assignment or transfer opportunity is set forth in Finding of Fact No. 17. These employees shall be entitled to transfer to future vacancies in road driver jobs on the basis of their competency to perform the duties of road driver and their company seniority. They shall be entitled to seniority carryover for all purposes, including bidding, layoff, and fringe benefits. United States v. Central Motor Lines, Inc., supra, 338 F.Supp. at 560; United States v. Jacksonville Terminal Co., supra, 451 F.2d at 459; Local 189, United Papermakers v. United States, supra, 416 F.2d at 983
 
 
 [3]
 The evidence in this case shows discrimination against entire classes of employees. While it may be true that some of the black and Spanish-surnamed American employees in these classes may not have been initially hired for or later transferred into road driver jobs even in the absence of discriminatory practicies, there is no reasonable method for determining at this late date who test individuals may be. The fact that no member of the affected classes may take advantage of the seniority carryover relief granted in this action unless he is presently qualified for a road driver job will prevent anyone from transferring into a job which he does not deserve. On the other hand, not all members of the affected classes who would have been hired as road drivers absent discrimination will be willing or able to transfer at this time; thus, some employees will never claim the relief to which they are entitled. Therefore, a remedy for the classes of incumbent employees excluded from the more desirable jobs because of discriminatory practices which will permit transfer without the loss of seniority is appropriate in this action. United States v. Bethlehem Steel, supra, 446 F.2d at p. 660; United States v. Central Motor Lines, supra, 338 F.Supp. at p. 560; United States v. Ironworkers, Local 86, 443 F.2d 544 (9th Cir. 1971), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); United States v. Dillon Supply Co., 429 F.2d 800 (4th Cir., 1970); Clark v. American Marine Corp., supra
 
 
 [4]
 Other elements of an appropriate decree include record keeping, reporting provisions, and the retention of jurisdiction by this Court. United States v. Central Motor Lines, Inc., supra, 338 F.Supp. at 562
 
 
 [5]
 Each side will bear its own costs.'
 
 
 [5]
 See, e.g., Rodriguez v. East Texas Motor Freight, 505 F.2d 40 (5th Cir. 1974); Herrera v. Yellow Freight Systems, Inc., 505 F.2d 66 (5th Cir. 1974); Resendis v. Lee Way Motor Freight, Inc., 505 F.2d 69 (5th Cir. 1974); Franks v. Bowman Transportation Co., 495 F.2d 398 (5th Cir.), cert. denied 419 U.S. 1050, 95 S.Ct. 625, 42 L.Ed.2d 644 (1974); Bing v. Roadway Express, Inc., 485 F.2d 441 (5th Cir. 1973); Local 189, United Papermakers & Paperworkers v. United States, 415 F.2d 980 (5th Cir. 1969), cert. denied 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970)
 
 
 [6]
 We reject the 'status quo' and 'freedom now' approaches described in the very influential Note, 'Title VII, Seniority Discrimination, and The Incumbent Negro', 80 Harv.L.Rev. 1260, 1268 (1967). 'Status quo' would in no case affect non-minority seniority rights while 'freedom now' would affect such rights and permit the ouster of non-minorities by minorities vested with remedial seniority
 
 
 [7]
 Note, supra n.6, 80 Harv.L.Rev. 1200, 1276--79 (1967). Compare Thornton v. East Texas Motor Freight, 497 F.2d 416, 420--21 (6th Cir. 1974) with Bing v. Roadway Express, Inc., 485 F.2d 441, 451 (5th Cir. 1973) and Franks v. Bowman, 495 F.2d 398, 414--18 (5th Cir.), cert. denied 419 U.S. 1050, 95 S.Ct. 625, 42 L.Ed.2d 644 (1974)
 
 
 [8]
 Cf. Rodriguez v. East Texas Motor Freight, 505 F.2d 40 (5th Cir. 1974)
 
 
 [9]
 Id
 
 
 [10]
 See pp. 14--16, infra